Argued and submitted September 8, accused suspended for 30 days
December 15, 1982

In Re: Complaint as to the Conduct of:

NEAL H. BELL,
*Accused.*

(SC 28670)

655 P2d 569

Richard W. Butler, Eugene, argued the cause for Accused. With him on the brief was Atherly, Butler & Burgott, Eugene.

John W. Hitchcock, McMinnville, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

The issue is the appropriate sanction for a violation of DR 7-110(B), which forbids a lawyer to communicate as to the merits of a case with a judge before whom the case is pending except in circumstances not pertinent to the circumstances of this case.

The following statement of facts is drawn from the accused's brief insofar as that statement has been accepted by the Oregon State Bar in its brief. Facts not drawn from the accused's brief are those which we find from our own review of the record.

Raymond Silbernagel was the purchaser at sheriff's sale of certain real property. Margaret Scott was a judgment creditor of the debtor whose property had been sold to Silbernagel. Scott's lawyer, knowing that the accused owned nearby property, called the accused to inquire whether there might be some financial advantage to the exercise of Scott's redemption rights. The accused opined that the property had been "bid in" too cheaply.

Scott and the accused entered into an agreement whereby the accused and his law partners would "put up" approximately $130,000 to permit Scott to exercise her rights of redemption. The accused and his partners took an option on the purchase of Scott's right of redemption. Scott was to be paid $750 for the option. The expectation of Scott, her lawyer, and the accused and his partners was that if Scott redeemed, the property would be re-redeemed, and the profits would be divided.[1]

Scott's redemption right was exercised. Shortly thereafter, Scott's deed and her assignment of her certificate of redemption running to the accused and his partners were recorded.

Silbernagel then filed suit to set aside the redemption sale and prevailed in the trial court. Upon appeal by Scott and the sheriff (Goin), the judgment was reversed on November 7, 1977, *Silbernagel v. Goin,* 31 Or App 545, 570

---

[1] As it turned out, there was no re-redemption, and the accused and his partners still owned the property at the time this matter was before the Trial Board.

P2d 1011 (1978), and review was denied in this court on February 7, 1978. The cause was then remanded to the trial court for "further proceedings pursuant to law and this Court's [the Court of Appeals] decision."

The accused and at least one of his partners were aware that Silbernagel's counsel contemplated filing an amended complaint and pursuing the cause further in the trial court. The accused and one of his partners discussed the matter and the partner told the accused that "they were getting no place with [Silbernagel's counsel] and maybe they should go ahead and submit the decree." This referred to a form of proposed decree which had been prepared and was so drawn as to terminate the suit in favor of defendants Scott and Goin. A copy of that form of proposed decree had not been submitted to Silbernagel's counsel.

On the day of that conversation, February 17, 1978, the accused took the proposed decree to the county courthouse with the intention of leaving it with the trial judge's secretary. The accused had no intention of presenting the form directly to the trial judge. The accused was aware that Silbernagel's counsel did not agree with the accused's law firm as to the proper interpretation and effect of the Court of Appeals decision and opposed the submission of a decree.

At the courthouse, the accused encountered the trial judge on an interior staircase. The judge inquired, more or less as a pleasantry, what brought the accused to the courthouse, and the accused responded that he had something to leave for signature. The judge put out his hand for it, and the accused surrendered it to the judge. The judge glanced through it and commented that he remembered that this was the case where there was a narrow issue as to whether a copy of the judgment or a copy of the docket of the judgment must be presented upon a proceeding to redeem. The accused testified as follows as to what then occurred:

> "I think he finished reading the decree. He asked me if the other side agreed with the decree and I said 'No' that they were — that they were still under the opinion that they could file an amended complaint."

"And one of us — either myself or the Judge — and I believe it was the Judge but I'm not sure, you know, said 'Well, they can have a hearing if, you know, there's some question on it.' And there's a wide banister there in the courthouse and the Judge just signed it. That's essentially what took place.

"Q. Did you show him the order too that had to be filed?

"A. He was reading it.

"Q. Well, you've got two separate documents you gave him — he signed the decree and then he signed the order?

"A. You'll have to excuse me, I don't remember. I think it's because I didn't do the papers. I remember absolutely nothing about anything other than the decree. Okay. He obviously signed both of them right then.

"Q. Okay.

"A. I don't remember anything about the order or the mandate.

"Q. And did you file the decree yourself do you think with the county clerk? In other words, there was nobody else with you that day was there?

"A. No. I just went over and filed it and did whatever else I was going to do.

"Q. Do you recall whether the Judge — did you tell the Judge whether or not [Silbernagel's counsel] or anybody in that firm had ever seen a copy of this decree?

"A. I don't think I did.

"Q. You don't recall whether he asked you that or not?

"A. I don't think he did.

"Q. And you didn't represent to him that you had any agreement from [Silbernagel's counsel's] firm to go ahead and submit the decree at that time?

"A. No. I was aware that they specifically felt they could file an amended complaint.

"Q. I'm going to ask you this. Don't you think — isn't it customary in the practice of law to submit a copy of the decree to the other side before you submit it to the Judge?

"A. Yeah, usually do.

"Q. Particularly where you know that the other side has some serious objections to the nature in which the proceedings are going as a result of that decree.

"A. Yeah, I guess so.

"Q. In other words, in this case by taking the decree, you were going to win the case; right?

"A. I don't — I don't — yes is the correct answer to your question. There wasn't as far as I know and there never has been any objection to the form of the decree. It's just that they felt that they should be entitled to file an amended complaint and that the decree would [terminate] the case so that they couldn't file an amended complaint.

"Q. They would have to appeal which they did right after that apparently. * * *"

On cross examination, the accused further testified:

"The only conversation with the Judge about the substance or the meat of the case that I can recall, and I'm pretty sure I recall everything, is that the Judge specifically asked me, you know, whether or not the other side had agreed with this. And I didn't really answer the question. He said, 'Did — does the other side agree with this order?' And my answer was, because this is what I thought the problem was, is that they felt that they were entitled to file an amended complaint, and to proceed further with the case.

"[Trial Board member]: That's not my question, though. What led you to believe that that was their position?

"[Accused]: Because this is what [Silbernagel's counsel] had indicated to me, and this is what they had put in their motion for reconsideration or something with the court. Because they had filed something —

"[Trial Board member]: With the Court of Appeals?

"[Accused]: — with the Court of Appeals, saying that the fact that the court had ruled on the summary judgment, didn't dispose of the case. It had only ruled on that and that they —

"[Trial Board member]: But the Judge's question was directed to that decree that you were asking to sign?

"[Accused]: I think the Judge asked me was 'Did they have any objection,' and my answer was, 'It's my understanding that, you know, they are entitled to file an amended complaint to proceed with this case.'

"[Trial Board member]: And his response to you was?

"[Accused]: He — we were about a foot from the banister and he just said, 'Well, you know, if there is a problem, we'll have a hearing on it.' It's kind of what we were hoping would happen, I guess, that we would either have a hearing or nothing would happen, and we would be done with it."

Before the Trial Board the trial judge testified that he had no recollection of the conversation but that it was not his normal practice to sign a decree or order when advised that some portion of it was in dispute without first giving the opportunity for a hearing on the dispute.

The accused promptly mailed to Silbernagel's counsel a conformed copy of the decree. Thereafter, Silbernagel's motion to set aside the decree was denied, and Silbernagel appealed. The Court of Appeals reversed and remanded, making it clear that the court did not consider its first decision as being a final determination of the merits of the cause. *Silbernagel v. Goin,* 41 Or App 269, 597 P2d 1287 (1979).[2]

The Trial Board found the accused guilty of the charge made in these proceedings and recommended that he be administered a public reprimand. The Trial Board wrote:

"This recommendation is based upon the fact that the accused's conduct derives as much or more from ignorance, inexperience and neglect as from malice, and is apparently an isolated instance rather than a link in a continuing chain of unprofessional conduct."

The Disciplinary Review Board substantially agreed with the Trial Board as to the facts and concluded:

"Finally, we note that the Trial Board has given the accused the benefit of the doubt where, from reading the transcript, we would not do so. Since, however, the Trial Board was there and could observe the accused's demeanor, we will accept what seems to be the Board's determination that the accused's conduct was basically in good faith. Having accepted the good faith of the accused, we must add that while the good faith of a lawyer is an important factor

---

[2] The opinion expressly criticizes the conduct of the accused and his firm in failing to apprise any court concerned with this litigation of the interest of that firm in the outcome of the proceedings.

in determining what discipline should be imposed, it does not *excuse* unethical conduct. *In re Barnes,* 281 Or 375, 381, 574 P2d 657 (1978); *In re Boivin,* 271 Or 419, 429, 533 P2d 171 (1975)." (Emphasis in original)

The Disciplinary Review Board recommended that the accused receive a public reprimand, but three of the seven members of that board dissented from that recommendation, taking the position that a thirty-day suspension from practice was a more appropriate sanction.

The accused petitioned this court to adopt the recommendation of the Disciplinary Review Board with respect to the imposition of a public reprimand. His brief concludes:

> "The accused has asked this Court to adopt the recommendation of the Disciplinary Review Board that a public reprimand be administered for the incident that took place. While he did not realize that he might be in violation of a Disciplinary Rule when he, by coincidence, engaged in a conversation with [the trial judge] concerning the decree, he understands that his lack of knowledge of the situation is not an excuse. However, in behalf of the accused, counsel submits that his inexperience, the coincidence of encountering the judge and his recollection of the conversation that took place show that there were no bad motives involved and that there was no intent whatsoever to deprive the other party of a hearing on his contentions.

> "While the plea of ignorance may not enhance one's reputation, one's knowledge, experience and background are nevertheless relevant in assessing the quality of the conduct called into question. One with more experience in litigation would no doubt have handled the matter differently, but Mr. Bell should not be judged in the same light.

> "Mr. Bell regrets what happened and is now certainly fully aware of the procedures that must be followed in connection with ex parte matters and of his ethical obligations."

In this court the Bar argues for some discipline greater than a public reprimand. The Bar takes the position that the accused had not been forthright with either the trial court or the Court of Appeals regarding his interest in the property. We agree that is so, and it is reasonable to infer that the trial judge might have been more cautious

in inquiring into the matter of possible opposition to the decree had he been aware of the accused's interest. Moreover, the Bar notes the further consequence of the forbidden ex parte communication, which necessitated the appeal and "financial loss" in that respect to Silbernagel.

In oral argument before this court, the accused's counsel summed up the accused's position upon final submission to this court as follows:

"Mr. Bell realizes that what happened was a violation of the disciplinary rule that is before us in this case. We denied the violation in our answer initially because it was the feeling that there was no discussion about the merits in the case, and it is our feeling that our evidence disagrees with evidence that [Silbernagel's counsel] testified about, but even assuming Mr. Bell's testimony is absolutely one hundred percent accurate unfortunately presents the order and to discuss the nature of the case at that particular time is a discussion on the merits and it may have some implied things about the merits of the case. But I do want to emphasize that Mr. Bell did not go to the courthouse with the intent of finding [the trial judge], discussing the case with him and presenting the order as it turned out. Mr. Bell knows that ignorance of the rule is not an excuse. He's learned that these things can't be and should not be done, and in behalf of my client I would urge the court to accept the recommendation so far of a public reprimand. Finally, there is no indication that, well, and there has been no other discipline imposed on Mr. Bell during his some sixteen years in practice."

A judge must be able to rely upon the candor, integrity and honesty of lawyers in handling ex parte matters. Experience teaches us that a large volume of judicial business is handled expeditiously and well upon an ex parte basis. A place for such business is regularly reserved upon court calendars. In order to process matters upon that basis, the judge must be able to rely upon the candor, honesty and integrity of the lawyer who presents a matter ex parte. Should the courts have to abandon the system of considering many matters ex parte upon the representation of the appearing counsel, the administration of justice would be seriously affected. *See In re Greene,* 290 Or 291, 297, 620 P2d 1379 (1980). The public must be protected from erosion of the administration of justice, and

one of the primary purposes of disciplinary proceedings is to protect the public and to demonstrate that the violation of the obligation to act ethically is a serious matter. *See In re English,* 290 Or 113, 125, 618 P2d 1275 (1980).

We find the appropriate sanction to be a short suspension from the privilege to practice law. We order that the accused be suspended from practicing law for a period of thirty days beginning with the effective date of this decision. *See* Oregon Rules of Appellate Procedure, 11.03(4). The Oregon State Bar is awarded its actual and necessary costs and disbursements. ORS 9.535(4).