691 P.2d 695

**In the Matter of a Member of the State Bar of Arizona James Lawrence RILEY, Respondent.**

**No. SB–289.**

Supreme Court of Arizona, In Banc.

Nov. 28, 1984.

Michael M. Sophy, Martha McConnell Bush, Phoenix, State Bar Counsel.

Bilby & Shoenhair, P.C. by William H. Tinney, Tucson, for respondent.

CAMERON, Justice.

Respondent, James L. Riley, was charged with eight counts of unethical conduct by the State Bar of Arizona. Although respondent is currently a Cochise County superior court judge, all conduct in question related to events which occurred while he was a deputy county attorney. The Local Administrative Committee found the respondent guilty of unethical conduct concerning four of the eight counts and recommended a thirty-day suspension. The Disciplinary Board agreed with the findings and conclusions of the Local Administrative Committee, and the respondent timely objected. We have jurisdiction pursuant to Rules 36(d) and 37, Rules of the Supreme Court, 17A A.R.S. We must address the following issues:

I. Did the State Bar Attorney Disciplinary Board have jurisdiction to determine whether a judge was guilty of unethical conduct which occurred before he became a judge?

II. Did the Local Administrative Committee err in amending its complaint to include two additional counts after the respondent had testified?

III. Was the respondent guilty of unethical conduct in that:

1. he made ex parte communications to the judge in a criminal matter;
2. he made false denials as to said ex parte communications;
3. while a candidate for judicial office he made derogatory public comments against his incumbent opponent; and
4. he made unfair comments on a decision made by the judge.

IV. Is a thirty-day suspension appropriate under the facts of this case?

V. May respondent be required to pay costs incurred by the Disciplinary Board while investigating all eight counts, even though respondent was found guilty of ethical violations concerning only four of those counts?

I

JURISDICTION

Pursuant to Art. 6.1 of the Arizona Constitution, the Commission on Judicial Qualifications has exclusive jurisdiction to investigate the conduct of a judge while he remains a judge. This is the law in most jurisdictions, *In re Investigation*, 93 So.2d 601 (Fla.1957), and the rule recommended by the American Bar Association. *See* Rule 3.1, Standards Relating to Judicial Discipline and Disability Retirement, Professional Discipline for Lawyers and Judges (1979), National Center for Professional Responsibility and The American Bar Association.

■ The lawyer disciplinary agency has jurisdiction over a lawyer for conduct which occurred while a lawyer, as well as jurisdiction over a lawyer who is no longer a judge for conduct that occurred during and prior to the time the lawyer became a judge. *See* Rule 3.2, Judicial Standards, supra; *Florida Bar v. McCain*, 330 So.2d 712 (Fla.1976).

As to jurisdiction over an incumbent judge for conduct which occurred prior to becoming a judge, the courts are not in agreement. The Standards for Lawyer Discipline and Disability Proceedings recommend that incumbent judges should not be subject to the jurisdiction of the lawyer discipline agencies, Rule 4.4, Lawyer Standards, supra, and some states follow this rule. *See State ex rel. Turner v. Earle*, 295 So.2d 609 (Fla.1974); *In re Proposed Disciplinary Action by the Florida Bar Against a Circuit Judge*, 103 So.2d 632 (Fla.1958).

■ We believe, however, the better and more workable practice is that jurisdiction in disciplinary actions should be based upon the position the individual held at the time of the alleged misconduct:

[h]ere, we are presented with an action to discipline a person, now serving as a judge, for misconduct committed while he was a lawyer and before he became a judge. Does his position on the bench render him immune to discipline for violation of the Code of Professional Responsibility applicable to all persons licensed to practice law in this state? Respondent argues that since he may not practice law while a judge, he may not be disciplined while a judge for misconduct committed while a lawyer. Although he may not practice law while a judge, he still holds a license to practice law (a qualification he must have to hold the office of judge), he is still a lawyer, and if he has violated the Code of Professional Responsibility he is, as an officer of this court, amenable to discipline * * *. He may not take refuge in a judicial office from discipline for prior misconduct, the effect of which would be removal of one of his qualifications for occupying the refuge. To permit the use of a judicial office as such a sanctuary would be a travesty upon justice.

*In re Mills*, 539 S.W.2d 447, 449–50 (Mo. 1976); *see also In re Spriggs*, 36 Ariz. 262, 284 P. 521 (1930). We believe that the State Bar Disciplinary Board and its local disciplinary committees have jurisdiction to consider a lawyer's alleged unethical conduct even though the lawyer is now an incumbent judge. It should be noted in this regard that the Supreme Court of Arizona has the exclusive jurisdiction to regulate the admission to the practice of the law and the discipline of those admitted. In the

instant case, while we are dealing with the power of the State Bar Disciplinary Board, we are actually talking about our own authority because the Bar Disciplinary Board and its committees are mere arms of this court and can have no greater jurisdiction or authority than this court. See *Florida Bar v. McCain,* supra, at 714. We conclude that respondent was subject to the jurisdiction of the State Bar of Arizona Disciplinary Board for conduct which occurred before he became a judge.

## II

## AMENDMENT OF COMPLAINT

During the hearings before the local disciplinary committee the respondent testified as to a matter in which he had been jailed for eight hours and fined $150 by Judge Richard Riley for contempt. After this testimony, the State Bar added the allegations of unethical conduct found in Counts Seven and Eight. The amended complaint was served on the respondent and he was granted an opportunity to respond. By stipulation respondent's counsel and Bar counsel agreed to waive further hearings upon Counts Seven and Eight, the additional charges. Respondent now alleges that his right to procedural due process, United States Constitution, Amend. V, and Ariz. Const. Art. 2, § 4, was violated, citing *Matter of Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968). *E.g., Committee on Professional Ethics and Grievances of the Virgin Islands Bar Association v. Johnson,* 447 F.2d 169, 173 (3rd Cir.1971); *Bar Association v. Cockrell,* 274 Md. 279, 286, 334 A.2d 85, 88 (1975). We do not agree.

In *Ruffalo,* supra, the United States Supreme Court held that an attorney charged with unethical conduct is entitled to due process. The court stated that the attorney in that case had been denied procedural due process because his own testimony in defense of the charges was made the basis of charges added to the complaint after the hearing. The United States Supreme Court stated:

These are adversary proceedings of a quasi-criminal nature. The charge must be known before the proceedings commence. They become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused. He can then be given no opportunity to expunge the earlier statements and start afresh.

*Ruffalo,* supra, 390 U.S. at 551, 88 S.Ct. at 1226, 20 L.Ed.2d at 122 (citations omitted). We believe that respondent's interpretation of *Ruffalo* is overbroad and would lead to absurd results. As the Maryland Court of Appeals has stated:

In reviewing this recommendation, we note initially that if *Ruffalo* is strictly applied as it literally reads, then its broad holding would have a crippling effect on the primary purpose of disciplinary proceedings, which, as we have held, is "not for punishment but rather [is] a catharsis for the profession and a prophylactic for the public." For example, if *Ruffalo* means in all cases what its words seem to indicate, once an attorney is brought before a disciplinary tribunal for some minor offense he can take the stand and make known every other professional indiscretion (perhaps even those of a more serious nature) he ever perpetrated and, in this way, immunize himself from any potential professional censorship for them because, under *Ruffalo,* "due process" would prevent an amendment of the initial allegations.

*Bar Association v. Cockrell,* supra, 274 Md. at 286, 334 A.2d at 88–89 (1975) (citations omitted, footnote omitted).

Our rule states:
Amendment. The committee at any time prior to the conclusion of the disciplinary hearing may allow amendments to the formal complaint or the answer. The formal complaint may be amended to conform to the proof or to include further charges, whether occurring before or after the commencement of the disciplinary hearing. If an amendment to the formal complaint is made, respondent

shall be given reasonable time to answer the amendment, to produce evidence and to respond to the charges.

Rule 34(c), Rules of the Supreme Court, 17A A.R.S. We believe our rule is constitutional so long as care is taken to assure that the respondent has a reasonable time and an appropriate opportunity to respond to the additional charges, *Matter of Swartz*, 129 Ariz. 288, 630 P.2d 1020 (1981), which is consistent with this reasoning. To hold otherwise would allow an attorney to immunize himself by testifying as to additional items of misconduct, see also *Bar Association*, supra. In the instant case, it appears that respondent had ample time and opportunity to respond. We find no error.

### III

### WAS THE RESPONDENT GUILTY OF UNETHICAL CONDUCT?

The Committee considered some eight allegations of misconduct by the respondent and found that he had violated the Code of Professional Responsibility in four instances. Because we agree with the Committee in their findings that as to four allegations the respondent was not guilty of unethical conduct, we need not set forth the facts of those instances of alleged misconduct. We will consider only the acts found by the Bar to be unethical.

In considering the facts of this matter, however, we must at the outset note that the record reflects what can only be described as a great deal of animosity between the respondent James L. Riley and Judge Richard Riley (no relation) over an extended period of time. Judge Riley on one occasion had held respondent in contempt, imposed a fine of $150, and ordered respondent to spend eight hours in the county jail. The facts of this incident were the basis for one of the allegations against respondent, but for which the Committee found for the respondent. In another incident during a criminal trial, Judge Riley ordered respondent not to question a witness about her plea agreement. The first question after the jury returned was, "Jen-nie, have you entered into a plea agreement in this case?" The respondent testified this was inadvertent, and on the motion for new trial another judge found that this was not intentional and the Local Administrative Committee found for the respondent.

During the trial, Judge Riley commented: Now let me say as I said earlier, you weren't candid with any of us yesterday about what took place at the previous trial. I am not going to have the reporter go through the exercise of reading it again, because you will again stand up and give some slippery semantical argument about you really don't know what you said that time and you might possibly come out with a polygraph. I think it is obvious that you intentionally elicited the reference to the polygraph, that you did it over the lunch hour and sandpapered your witness because she had been terribly hurt on cross examination by Mr. Lerma and Mr. Hoggatt, and you were trying to rehabilitate her.

Even though Judge Riley for many years prior to becoming a judge had been County Attorney of Cochise County, it is evident that respondent believed Judge Riley was biased against the County Attorney's Office in general and respondent in particular. It is also apparent that respondent's decision to run against Judge Riley was based at least in part on the animosity between the two. In that election respondent defeated Judge Riley. We also note that the conduct of Judge Riley is not before this court. If there was misconduct by Judge Riley, and we express no opinion that there was misconduct, it is not considered in this opinion.

#### 1. *Ex Parte Communication*

The first set of facts involve the "Moroyoqui" case (July, 1979). Defendant Moroyoqui had been convicted of drug transportation. Prior to defendant's sentencing hearing respondent approached Judge Riley in chambers with Officer Breen, a criminal Strike Force Agent. When respondent and the officer arrived, defense counsel Bertram Polis was sitting in Judge Riley's

chambers. Respondent told Judge Riley that he had information to impart to him prior to sentencing and Polis was asked to leave. Polis objected, but did leave. Officer Breen then conveyed his information and was asked to leave by Judge Riley. Polis stated at his client's sentencing hearing that such a communication had occurred and he registered an objection. At the hearing before the Local Administrative Committee, Judge Riley and respondent gave differing testimony about what then occurred. Judge Riley testified that, after he accused the respondent of trying to influence the sentencing through an ex parte communication, the respondent pounded his fist on the judge's desk and yelled at him. Respondent denies these accusations. Polis and Officer Breen, who were standing outside the judge's chambers, testified that the only voice loud enough to be heard outside of chambers was that of Judge Riley. Although respondent at the time denied trying to influence the judge in the sentencing of the defendant, he did admit this in his testimony before the Local Administrative Committee:

> MR. CAVETT (Committee member): * * * you testified to it this morning I think—that you brought the Strike Force man to the Judge's chambers in order to get him to give information to the Judge. Is that right?
>
> MR. RILEY: That's true.
>
> MR. CAVETT: And that was information that you believed would be, in terms of aggravation, with regard to the sentencing procedure as opposed to mitigation?
>
> MR. RILEY: That's—that's true.

Respondent was charged with making an improper ex parte communication to a judge. Judge Riley testified that respondent intentionally made such a communication in the hope of enhancing the punishment, and respondent, as noted above, admitted to the Committee that this was his intent. The Committee found that respondent engaged in an ex parte communication with Judge Riley in violation of Disciplinary Rules 1–102(A)(5), conduct prejudicial

to the administration of justice, 1–102(A)(6), conduct that adversely reflects on a lawyer's fitness to practice law, and 7–110(B), Rule 29(a), Rules of the Arizona Supreme Court, 17A A.R.S. DR 7–110(B) reads:

> (B) In an adversary proceeding, a lawyer shall not communicate, or cause another to communicate, as to the merits of the cause with a judge or an official before whom the proceeding is pending, except:
>
> (1) In the course of official proceedings in the cause.
>
> (2) In writing if he promptly delivers a copy of the writing to opposing counsel or to the adverse party if he is not represented by a lawyer.
>
> (3) Orally upon adequate notice to opposing counsel or to the adverse party if he is not represented by a lawyer.
>
> (4) As otherwise authorized by law.

This DR is buttressed by the ABA Standards for Criminal Justice, Vol. I, Ch. 3, Standard 3–2.8(c) which states, "It is unprofessional conduct for a prosecutor to engage in unauthorized ex parte discussions with or submission of material to a judge relating to a particular case which is or may come before the judge." *See also In re Conduct of Bell*, 294 Or. 202, 210, 655 P.2d 569, 573 (1982); *accord, The Florida Bar v. Mason*, 334 So.2d 1 (Fla.1976).

We agree with the Committee that respondent did, indeed, make an improper ex parte communication to Judge Richard Riley. We further find that this charge was supported through the presentation of clear and convincing evidence. *Matter of Swartz*, supra. We therefore find respondent guilty of making an improper ex parte communication under DR 1–102(A)(5) & (6) and 7–110(B), Rule 29(a), Rules of the Arizona Supreme Court, 17A A.R.S. *See also* ABA Model Rules of Professional Conduct (MR) 3.5(b) and 8.4(f).

## 2. False Denials

After this incident and at the Moroyoqui sentencing hearing, defense counsel objected, claiming:

The attempt has been made by the prosecution to influence this Court by going into your office prior to this hearing with an officer in tow, the officer being Sergeant Breen, the officer on this case. Sergeant Breen, I believe also came into your office to talk to you about the disposition of this case right before the hearing and requested that I leave.

THE COURT: That's correct.

During the hearing the following conversation took place:

MR. RILEY: Your Honor, many of the things that defense counsel have said here have been in the sense of personal attacks upon me and upon my performance of my duties as I see them under the law, and *I refute and deny each and every one of them,* and I ask that the record reflect only one thing. *Mr. Polis has accused me of ex-parteing (sic) the Judge before the imposition of sentence.*

I would like the record to show that, before I arrived with Sergeant Breen, Mr. Polis was in with the Judge speaking about the sentence, and I would like the record to reflect that *no information was conveyed to the Judge about Mr. Moroyoqui,* that the information by Breen concerned other individuals that participated, we believe, in the commission of this offense and their activities and their conduct up to this point in time were the substance of the information that we felt was necessary to be conveyed to the Judge, and that was no bad faith and no attempt at irregularities or an end run around this Court's attitude or position, and the State sincerely apologizes to the Judge and Mr. Polis, if he feels there was any impropriety in the case.

THE COURT: What was the purpose in having Sergeant Breen talk to me prior to sentencing in my chambers?

MR. RILEY: The State's position, Your Honor, was that in order to impose a just sentence, the Court should be well aware of all facts and circumstances surrounding this case and not just Mr.

Moroyoqui's position and his conduct and that in order to impose just that sentence, a just one, it was necessary for the Court to be fully informed and the information conveyed to the Court was of a sensitive nature, and if that information were to be released to the defense or to the public, it would jeopardize an on-going investigation and perhaps jeopardize the lives of certain individuals.

THE COURT: Was it not derogatory of Mr. Moroyoqui?

MR. RILEY: Your Honor, the State believes Mr. Moroyoqui had no part in the conduct and the discussion of that conduct in your chambers. I believe, and I am giving Mr. Moroyoqui the benefit of the doubt, by saying that whatever has been done by the individuals we discussed in chambers was more than likely done without his knowledge.

THE COURT: Well, let me clear up the record. I invited Mr. Polis into chambers. I left my door open anticipating your arrival, because Mr. Polis asked me if I would be receptive to a continuance.

\* \* \* . \* \* \*

Mr. Riley, I can only characterize what took place in my chambers before the sentencing as an attempt to influence the Court. \* \* \* You attempted to tell me matters that were derogatory of Mr. Moroyoqui, and when I asked you if you were aware of the law about sentencing someone on matters that were not in the Presentence Report, you advised me that I could come into Court and state I was ignoring all that, just going with the Presentence Report. That was after you had abruptly removed Mr. Polis from my office and told him you were going to deal with a sensitive matter concerning Mr. Moroyoqui.

\* \* \* An attempt was made to influence my decision, not only between imprisonment or probation, but also the date of imprisonment, and I was

told that it would be an insult to Judge Helm if I were to sentence Mr. Moroyoqui right now, that I was to leave him dangling and have his term start after or when he arrived at the State Prison.

Respondent was charged with denying that he made an improper communication to a judge. Based upon this testimony, the Committee found that "respondent's statements in court were false, that the respondent knew such statements were false, and that no attempt was made by the respondent to candidly and forthrightly describe the actual *ex parte* conversation." At the time, respondent had been admitted to practice for less than five years, and even though respondent's improper conduct in the ex parte comments to the judge might have been excused because of respondent's youth and inexperience, respondent's lack of candor at the sentencing cannot. It is obvious that respondent was trying ex parte to influence the judge in the hope that the judge would impose a more severe sentence, a fact which respondent, after several years of reflection, did admit to the Local Administrative Committee. Respondent was guilty of violating DR 1–102(A)(4), misrepresentation, 1–102(A)(5), conduct prejudicial to the administration of justice, and 7–102(A)(5), false statements. Rule 29(a), Rules of the Arizona Supreme Court, 17A A.R.S.

### 3. Derogatory Comments

■■■ We now consider public statements made by respondent, some before and some during respondent's judicial campaign. DR 8–103 provides:

(A) A lawyer who is a candidate for judicial office shall comply with the applicable provisions of Canon 7 of the Code of Judicial Conduct.

Canon 7 of the Code of Judicial Conduct reads in part:

A. Judge Should Refrain from Political Activity Inappropriate to His Judicial Office

\* \* \* \* \* \*

B. Judicial Campaign Conduct.

(1) A candidate, including an incumbent judge, for a judicial office that is filled either by public election between competing candidates or on the basis of merit system election:

(a) should maintain the dignity appropriate to judicial office \* \* \*

\* \* \* \* \* \*

(c) should not \* \* \* misrepresent his identity, qualifications, present position, or other fact.

Rule 45, Rules of the Supreme Court, 17A A.R.S. Even if not a candidate for judicial office, a lawyer is held to a narrower standard of free speech than a non-lawyer when discussing the judiciary:

A layman may, perhaps, pursue his theories of free speech or political activities until he runs afoul of the penalties of libel or slander, or into some infraction of our statutory law. A member of the bar can, and will, be stopped at the point where he infringes our Canon of Ethics; and if he wishes to remain a member of the bar he will conduct himself in accordance therewith.

*In re Woodward,* 300 S.W.2d 385, 393–94 (Mo.1957); *e.g., State v. Russell,* 227 Kan. 897, 901–02, 610 P.2d 1122, 1126 (1980); *In re Raggio,* 87 Nev. 369, 370–71, 487 P.2d 499, 501 (1971). A lawyer may be disciplined if his public comments threaten a significant state interest. *Polk v. State Bar of Texas,* 374 F.Supp. 784, 787 (N.D. Tex.1974); *Russell,* supra, 227 Kan. at 901, 610 P.2d at 1126. The good standing of the judicial system is such a significant interest. *See Polk,* at 788. Generally, and also during a judicial campaign, a lawyer may accurately criticize a sitting judge, but may not impugn the integrity of the judicial system or question the decisions of the judge. *Cf., In re Sawyer,* 360 U.S. 622, 636, 79 S.Ct. 1376, 1383, 3 L.Ed.2d 1473, 1483 (1959); *In re Hinds,* 90 N.J. 604, 634, 449 A.2d 483, 499 (1982); *In re Baker,* 218 Kan. 209, 214, 542 P.2d 701, 706 (1975).

Respondent made derogatory public statements against Judge Riley. Respondent told reporters that: (1) as to the contempt order, supra, "it's crazy, it's abso-

lutely insane" and was "motivated by revenge on the part of [Richard Riley]," and later that (2) Richard Riley was vindictive, partial, and "[t]he state simply doesn't get a fair trial in his court." Respondent was found guilty of violating DR 1–102(A)(5), conduct prejudicial to the administration of justice, although the Committee stated that it felt "considerable empathy for the respondent in the circumstances in which these statements were made * * *."

■ We agree with the Committee that respondent was guilty of conduct prejudicial to the administration of justice under DR 1–102(A)(5). Respondent's comments cited above, and particularly the statement that "[t]he state simply doesn't get a fair trial in his court," questioned the decisions of the court and the administration of justice. This a lawyer cannot do, even in a campaign for judicial office.

We note, however, that the Committee also found that the following remarks amounted to unethical conduct.

> The two criticisms we've leveled at the judge more than any other are lack of judicial temperament and unpredictability. They go hand-in-hand. A man who lacks judicial temperament has his emotions rather than reason, control his actions and when that happens you arrive at unpredictable results.

In this we disagree with the Committee.

■ Freedom of speech does allow fair comment even by a lawyer candidate concerning a judge opponent:

> A candidate for non judicial office is free to announce his stand on the issues he must pass upon in office, and to pledge his vote on those issues; the judicial candidate is forbidden to enter this customary campaign arena. Hence, unless the election is to be a pure popularity contest based on name recognition alone, the only legitimate area for debate is the relative qualifications of the candidates. In our view, the health, work habits, experience and ability of the candidates are all matters of legitimate concern to the electorate who must make the choice.

*In re Baker*, supra, at 213, 542 P.2d at 705. We agree.

■ We believe that candidates for judicial office have a First Amendment right to criticize an incumbent judge for such matters as intemperate behavior, injudicious actions, lack of judicial temperament, unpredictability, and unnecessary delay in rendering decisions. We are aware that the line between fair comment and impermissible comment is indistinct and also that judges are relatively helpless to defend themselves from such attacks. Nevertheless, in jurisdictions that require the election of judges, such comment must be allowed.

■ Lawyers who are candidates for judicial office may not impugn the integrity of the judicial system or question the decisions of the judge. *In re Sawyer*, supra. Lawyers may make fair comment on the judge's fitness so long as the comment does not call into question decisions of the court or question the integrity of the judicial system. For example, a lawyer may criticize a judge for unnecessary delay in reaching a decision, but may not question the decision itself except on appeal. This is not to say, however, that a lawyer may not publicly disagree with a judge's decision. Proper avenues for questioning a decision include the appellate route and disciplinary proceedings where appropriate. What we condemn is conduct which denigrates the judicial system as a whole and undermines the public's confidence in it. The dissent in this case notwithstanding, we believe that our opinion here today in no way diminishes the First Amendment freedoms enjoyed by lawyers.

### 4. Unfair Comments

Count Six, and the most serious, concerned unfair statements made by respondent while running against Judge Riley for judicial office. These statements included the following made at an evening meeting of Cochise County employees:

> There are a number of decisions that have been made by the judge [Richard Riley] that have no basis in fact or in law

**614**

and I feel that they have been a waste of your time and your money and mine. One of the best examples that I have seen, and it has happened in the last couple of weeks, ladies and gentlemen, is the case of *McMullin v. Hargis.* Many of you are aware of the enormous amount of media coverage of that case—it is the one that involves the indigent health care standards, and a couple of weeks ago, perhaps slightly more than that, Judge Riley made a decision which would have lowered the indigent standards in this county to the point that the financial impact on you and I would have been tremendous. Many people were talking in terms of bankruptcy of the county, laying off county employees. ·

The Committee found, and the record supports the finding, that "the statement quoted above was in reference to a ruling that Judge Richard Riley [made], pursuant to the mandate of the Arizona Court of Appeals; that the respondent knew, or should have known, that Judge Riley had no discretion in making that ruling; and that the statement was made either with an awareness that it was untrue, or with reckless disregard for the truth or falsity of the statement * * *."

In light of the Court of Appeals' ruling, Judge Riley had no choice but to issue the order he did. Respondent's statement concerning the *McMullin* case exceeded the limits of fair comment and left his audience with a false impression of what actually occurred concerning this matter. This kind of "campaign rhetoric" is contrary to Canon 7 of the Code of Judicial Conduct which provides that a judge who is a candidate for political office should not misrepresent facts. Canon 7(B)(1)(c), Rule 45, Arizona Rules of the Supreme Court, 17 A.R.S. *See State ex rel. Nebraska State Bar Ass'n v. Michaelis,* 210 Neb. 545, 559–61, 316 N.W.2d 46, 54–55 (1982). Respondent's comments exceeded the realm of fair comment. *See In Re Richeson,* 64 Ariz. 85, 87, 166 P.2d 583, 584 (1946).

■ We note also that respondent criticized Judge Riley for allegedly discussing the *McMullen v. Hargis* case with a member of the Cochise County Board of Supervisors. Respondent stated:

First of all, I would like to read to you one of the judicial canons of ethics. Canon 3, page four, and it is entitled "Adjudicative Responsibilities":

A judge should accord to every person who is legally interested in a proceeding or his lawyer, full right to be heard according to the law and except as authorized by law, either initiate nor consider ex parte applications concerning a pending or impending proceeding. A judge however, may obtain the advice of a disinterested expert on the law applicable to a proceeding.

What that says, ladies and gentlemen, is that in any criminal proceeding, civil or criminal, both sides have the right to be heard and [n]either side has the right to be heard alone. Both sides have the right to know what's going on in a case, and by calling Mr. Jones on the phone and by discussing the merits of the *McMullen v. Hargis* case with Mr. Jones, *Judge Riley committed an unethical act.* It's as simple as that.

Any grievance a lawyer may have concerning ethical misconduct by a sitting judge should be submitted to the Commission on Judicial Qualifications. "Going public" by a member of the Bar is not the appropriate method to redress misconduct by a judge. As the South Dakota Supreme Court has noted:

That respondent sought instead to voice his complaints in precisely the manner and forum that would most likely cast doubt upon the competence and integrity of the member of the judiciary without the slightest possibility that any constructive, remedial actions would result from those remarks belies respondent's assertions that he made the statement in good faith and in the spirit of constructive criticism.

*In re Lacey,* 283 N.W.2d 250, 252 (S.D. 1979). *Accord, People ex rel. Chicago Bar Ass'n v. Metzen,* 291 Ill. 55, 58, 125 N.E. 734, 735 (1919).

## IV

### APPROPRIATE SANCTION

■ We note at first that a judge of the superior court shall be "admitted to the practice of the law in and a resident of the state for five years next preceding their taking office." Ariz. Const. Art. 6, § 22. This court by rule provides that "[m]embers of the State Bar shall be divided into three classes: active, retired, and honorary." Honorary members include judges. Rule 27(c), Rules of the Supreme Court, 17A A.R.S. Although § 28 of Art. 6 of the Arizona Constitution prohibits the practice of law by a "judge of any court of record," this does not mean that a judge need not remain in good standing with the Bar when he becomes a judge. By including both membership in the Bar and residency in the same phrase, we believe the people, in adopting the Constitution, intended that, as a requisite to holding judicial office, a judge must remain both in good standing and be a resident of the state. Indeed, as to the latter, Art. 6, § 34 provides that if a judge "absents himself from the state for more than sixty consecutive days," the judge shall be deemed to have forfeited his office. We believe it follows that disbarment or even suspension would operate as a removal from office. *But see Spriggs*, supra, where the court refrained from deciding this question.

We must now determine whether a thirty-day suspension is an appropriate sanction in this case. We believe that respondent's conduct prejudiced the administration of justice, undermined the decisions of the superior court, and was intentionally misleading. Additionally, although respondent voiced concern about the judge, he failed to contact the Commission on Judicial Qualifications. Instead of following the appropriate channels of redress, the respondent "went public" with his complaints as part of his campaign for office.

■ We have noted that, "The discipline in each situation must be tailored for the individual case; neither perfection nor absolute uniformity can be achieved." *In re Wines*, 135 Ariz. 203, 207, 660 P.2d 454, 458 (1983). We believe that the sanctions imposed by the Committee in the instant case were fair, reasonable, and justified. We would impose a thirty-day suspension were it not for the fact that the respondent is now an incumbent judge. The purpose of disciplining both judges and lawyers is not to punish but to protect the courts and the public. *In re Echeles*, 430 F.2d 347, 349 (7th Cir.1970). *See also* Comment 1.1, Standards Relating to Judicial Discipline and Disability Retirement Standards, supra. The judicial standards also note:

> Apart from interim suspension, the standards do not recommend suspension of a judge without pay. Suspension punishes the judge's colleagues because they must carry an extra burden during the suspension.

Comment 6.7, Standards Relating to Judicial Discipline and Disability Retirement. The record before the court contains affidavits from the other two judges in Cochise County concerning the disruption that would occur if the respondent were suspended (both judges evidently assumed that suspension would not result in forfeiture of office). Because we believe that suspension would be unnecessarily disruptive, we find that public censure is the more appropriate sanction and so hold.

## V

### ALLOCATION OF COSTS

Respondent argues that because he was not found guilty concerning all eight counts alleged he should not have to pay the total costs and expenses incurred by the State Bar while investigating and proceeding with his case. He further argues that he should have to pay only the costs and expenses arising from the counts whereupon he was found guilty of unethical conduct.

Our rules state that:

> . 1. The judgment of this court in any disciplinary proceedings shall fix the amount of costs and expenses to be paid by the respondent attorney before he may be reinstated and no suspended at-

torney shall resume practice until the amount of the costs and expenses so fixed has been fully paid, * * *.

Rule 37(g), Rules of the Arizona Supreme Court, 17A A.R.S.

 The State Bar found respondent guilty of four counts of unethical conduct and we agree with these findings. Although the State Bar submitted a very detailed itemized list of costs and expenditures, this list was not categorized by counts. We do not think, however, that categorization by counts is necessary. Respondent was found guilty of four ethical violations and is therefore responsible for costs and expenses incurred during this proceeding. *See In re Kleindienst,* 132 Ariz. 95, 644 P.2d 249 (1982) (attorney found guilty of two out of nine charges ordered to pay costs and expenses of the proceeding). Only if the Bar fails to provide an itemized breakdown of costs will the Bar be disallowed such costs. *In re Davis,* 129 Ariz. 1, 4, 628 P.2d 38, 41 (1981). Rule 37(g), supra, does not expressly state that costs and expenses must be allocated to separate counts. We have reviewed the Bar's itemized list of costs and expenses and have determined that they were necessary and reasonable. We also believe that the Bar pursued the investigation of each count in good faith. The respondent should pay the amount assessed.

It is ordered that the respondent, James Lawrence Riley, be publicly censured for unethical conduct, and further that he pay to the State Bar of Arizona costs and expenses totaling $6,459.22 within sixty days from the issuance of the mandate in this case.

GORDON, V.C.J., and HAYS, J., concur.

FELDMAN, Justice, specially concurring,

I write separately because I disagree with a portion of the majority opinion which pertains to the lawyer's right to make public statements regarding a sitting judge. I do not believe that it is necessary in this case to attempt to draw a line between the first amendment rights of the lawyer and the general power of the court to control the conduct of counsel. I have no hesitancy, however, in joining with the holding that comments from a lawyer participating in a trial which characterize a ruling or the judge as "crazy" or "insane" (*see* majority opinion, *ante* at 705–706) are inappropriate and may form a proper subject for imposition of discipline under DR 1–102(A)(5). *See In re Woodward,* 300 S.W.2d 385 (Mo.1957). Lawyers are not free to try their cases in the newspaper, nor are they free to bring their appeal to a board of newspaper editors rather than the appellate court. Thus, I believe that respondent may be disciplined for comments made about Judge Riley and during the pendency of a case in which he was appearing before Judge Riley.

I also agree with the majority that respondent may be disciplined for criticizing Judge Riley for entering an order which was required by the mandate of a higher court. Lawyers have a special obligation to uphold the existence and integrity of the judicial system (DR 1–102(A)(5)), and their first amendment rights may be curtailed, at least a little, in order to accomplish this objective. Therefore, lawyers may criticize a judge or his decisions, but they are not free to mislead or to misrepresent the facts. When respondent criticized Judge Riley for entering the mandated order without indicating that Judge Riley had no choice in so doing, he intentionally and knowingly distorted and misrepresented the facts. While criticism of a judge or his decisions is not a breach of the lawyer's duty to uphold the integrity of the judicial system, criticism accomplished by knowing distortion or misrepresentation of fact does breach the lawyer's special duty and is the proper subject of discipline.

I do not believe that respondent may be disciplined for his other comments or criticisms of Judge Riley or Judge Riley's decisions. Whether respondent was right or wrong, he had a first amendment right to criticize a judge, a judge's qualifications and a judge's performance in office. This is especially true in states such as Arizona

where some judges are elected and where the retention of other judges is a matter for the voters. Ariz. Const. art. 6, §§ 12, 38. Thus, I do not believe that respondent can be disciplined for all of the comments made.

Because I do believe he may be disciplined for the comments involving the pending case and those relating to the entry of the mandated order, I concur in the result. I specifically join in the portion of the opinion relating to jurisdiction of the bar disciplinary process over sitting judges. We cannot establish a rule which would permit an erring lawyer to avoid discipline for unethical conduct because he or she happened to get elected or appointed to the judiciary. The bench is not a sanctuary for miscreant attorneys.

HOLOHAN, Chief Justice, dissenting.

If this court had jurisdiction to hear the matter as it came to us, I could agree with the court that the respondent was guilty of unethical conduct in at least three instances. I dissent from the opinion of the court because I conclude that this court has no jurisdiction to hear the matter, and I believe that the restrictions announced by the majority limiting statements by lawyer candidates for judicial office are incompatible with the freedoms granted by the First Amendment to the United States Constitution.

## JURISDICTION

The State Bar of Arizona assumed jurisdiction to conduct hearings on eight counts of unethical conduct charged against the respondent for his activities as a candidate for superior court judge. The proceedings were undertaken after the respondent became a judge of the superior court. It is my conclusion that the State Bar of Arizona has no jurisdiction to conduct hearings or make a recommendation for discipline of a superior court judge. The Bar's action in this case results in an assumption of power by a lawyer group over the judiciary in a way that constitutes a threat to the independence of the judicial department.

Although the majority acknowledges that there is substantial authority which holds that an incumbent judge should not be subject to the jurisdiction of a lawyer discipline agency, *ante,* at 698; nevertheless, the majority concludes that the better and more workable practice is to allow the lawyer agency to proceed to hear the matter.

Over fifty years ago in the case of *In re Spriggs,* 36 Ariz. 262, 284 P. 521 (1930), the Arizona Supreme Court held that a judicial officer could be disbarred after leaving office for acts committed while a judicial officer if an ordinary attorney could be disbarred for the same acts. The court at that time left expressly undecided the question of the effect of disbarment if the respondent was still on the bench. At first blush this case would appear to be authority in support of the majority's position except for one vital factor—the Constitution of Arizona was amended in 1970 to add Article 6.1. The provisions of Article 6.1 of the Arizona Constitution provide the exclusive remedy for any disciplinary action against justices of the peace, judges of the superior court, judges of the court of appeals, and justices of this court.

Whether the Judicial Qualifications Commission created by Article 6.1 would have jurisdiction over the acts of a judicial officer committed before the judge assumed the bench is a matter which is presently pending before us in another case. Irrespective of our answer to that question, it appears to me that there has been a gross violation of the Constitution in the method by which we have presumed to act in this case. The most that can be said for this court's decision is that the conduct of the respondent may have compelled the majority to ignore the clear mandates of the Arizona Constitution.

## CRITICISM OF THE JUDICIARY

The respondent was found guilty of violating DR 1-102(A)(5), conduct prejudicial to the administration of justice. The majority sustained the finding of the commit-

618

tee. The majority opinion, *ante* at 704, states that the comments of the respondent questioned the decisions of the court and the administration of justice. "This a lawyer cannot do, even in a campaign for judicial office." Further, *ante* at 704, the court holds that lawyers who are candidates for judicial office may not impugn the integrity of the judicial system *or question the decisions of the judge*. The majority allows a lawyer to criticize a judge for unnecessary delay in reaching a decision, but the attorney may not question the decision itself except on appeal, *ante* at 704 and 705. The broad, sweeping generalities of these statements casts serious doubt on their constitutionality in view of the First Amendment to the United States Constitution and Section 6, Article II of the Arizona Constitution. If the court's opinion had limited itself to statements by the lawyer candidate which were false, misleading, or concerning pending litigation, I could have joined in that portion of the opinion. The holding that a lawyer as a candidate for judge may not criticize the decisions of a sitting judge, however, is neither in harmony with the First Amendment nor with the necessities of a free society.

Judges are not unique in the realm of public officeholders. The record books regretfully show that some have been dishonest, incompetent, and prejudiced. A ruling that a lawyer as a candidate for the judiciary cannot bring such facts to the public notice, if such be the facts, is a threat to our constitutional system. Often the only way the deficiencies or prejudices of a judge can be shown is by referring to specific cases or categories of cases decided by that judge.

Although there are statements in some of the cases which seem to support the majority position, a closer analysis of the cases shows that the actual questioned conduct dealt with matters of misstatement and falsehood rather than general statements about the decisions of a judge. *See* 12 A.L.R.3d 1408, *Attorney's Criticism of Judicial Acts As Ground of Disciplinary Action.*

Under the freedom guaranteed by the Constitution, we must begin with the proposition that "[l]ike other citizens, attorneys are entitled to the full protection of the First Amendment, even as participants in the administration of justice." *In re Hinds,* 90 N.J. 604, 614, 449 A.2d 483, 489 (1982). A review of the cases in which attorneys were disciplined for campaign comments directed at an incumbent judge strongly suggests that, absent misrepresentation, courts should be most reluctant to impose discipline upon an attorney for comments during a judicial campaign except in egregious circumstances where a candidate seriously denigrates the judicial system, impugns the reputation of an incumbent judge, or in any way interferes with an ongoing proceeding. *See In re Donohoe,* 90 Wash.2d 173, 580 P.2d 1093 (1978); *In re Baker,* 218 Kan. 209, 542 P.2d 701 (1975); *In re Gorsuch,* 76 S.D. 191, 75 N.W.2d 644 (1956); *State Board of Law Examiners v. Spriggs,* 61 Wyo. 70, 155 P.2d 285 (1945); *cf. In re Hinds, supra, State v. Russell,* 227 Kan. 897, 610 P.2d 1122 (1980); *cf. generally, Election Campaign Activities as Ground for Disciplining Attorney,* 26 A.L.R. 4th 170. Campaign criticism of an incumbent judge's decisions, voting record, courtroom demeanor, or work habits, however, should be considered fair comment.

Attorney discipline is clearly warranted where speech directed at an incumbent judge knowingly contains a false statement of fact. *See In re Donohoe, supra,* (censure for campaign advertisements misrepresenting opponent's trial record); *In re Baker, supra,* (censure for advertisement misrepresenting incumbent judge's eligibility for disability and retirement income), *cf. State v. Russell, supra,* (censure for advertisement misrepresenting opponent's honesty in business transactions), *Louisiana State Bar Ass'n v. Karst,* 428 So.2d 406 (La.1983) (suspension for false accusation against judge). Thus, the public statements by the respondent that the incumbent judge would have been responsible for lowering indigent health care standards

based upon his role in the *McMullin v. Hargis* case is an example of the type of misstatement for which sanctions may be imposed. The incumbent judge was following the mandates of the appellate court as he was required by law to do. The respondent's statements about the incumbent judge's responsibility were false and misleading.

While misstatement of fact by an attorney universally warrants sanction, the law is equally clear that an attorney may criticize the legal decisions of a judge without sanction, so long as these comments do not interfere with ongoing proceedings. *See In re Sawyer,* 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959). *Accord In re Hinds, supra.*

> We are dealing with a delicate balancing of rights involving the public, the incumbent judge, and the lawyer candidate for judicial office. On the one hand the courts, as an institution, are entitled to the respect due to the *office* because the acceptance of judicial decisions ultimately depends upon the citizens' belief in the integrity and impartiality of the courts. On the other hand, the members of the judiciary are subject to legitimate and accurate criticism and evaluation.

*In re Donohoe, supra,* 90 Wash.2d at 180, 580 P.2d at 1097. In a political system in which a premium is placed upon the free dissemination of information to allow the electorate to make an informed decision concerning choice of candidates, however, courts should be hesitant to impose rules restricting the flow of information.

The broad general statements in the majority opinion serve to stifle honest and truthful discussion about the decisions of a judge or court. As I read the majority opinion, a lawyer may appeal a case, but the lawyer may never comment after the case is finally resolved that the case made bad law, poor policy, or resulted in an injustice. Such a position is not only contrary to the Constitution, but it also deprives the public of necessary information to make an informed decision about the performance of their judges.