Argued and submitted January 12, accused reprimanded July 15, 2004

# In re Complaint as to the Conduct of
## JAMES E. LEUENBERGER,
### *Accused.*

## (OSB 98-59; SC S50178)

93 P3d 786

*See also* 171 Or App 301, 15 P3d 93.

Terrance L. McCauley, Estacada, argued the cause and filed the brief for the accused.

Richard A. Weill, Bar Counsel, Troutdale, argued the cause for the Oregon State Bar. Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, filed the brief for the Oregon State Bar.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.*

PER CURIAM

* Kistler, J., did not participate in the consideration or decision of this case.

**PER CURIAM**

In this lawyer disciplinary proceeding, the Oregon State Bar alleged that lawyer James E. Leuenberger (the accused) had violated Code of Professional Responsibility Disciplinary Rule (DR) 7-102(A)(1) (knowingly taking action that served merely to harass or maliciously injure another) (two counts); DR 7-102(A)(2) (knowingly advancing legally unwarranted claim or defense) (three counts); DR 7-106(C)(7) (intentionally violating established procedural rule) (two counts); DR 7-110(B)(2) and (3) (communicating with judge as to merits of cause, without promptly delivering copy of written communication to opposing counsel or providing adequate notice of oral communication to opposing counsel) (two counts); DR 1-102(A)(4) (engaging in conduct prejudicial to administration of justice) (two counts); and DR 5-101(A)(1) (continuing employment, except with client's consent after full disclosure, when lawyer's own interests reasonably may affect exercise of professional judgment). A trial panel of the Disciplinary Board determined that the accused had violated the rules as charged, with the exception of two counts of DR 7-102(A)(2) and one count of DR 7-106(C)(7). The trial panel imposed a 90-day suspension.

The accused has petitioned this court for review under ORS 9.536(1) and BR 10.3, challenging the trial panel's violation determinations and its selected sanction. We review *de novo*, ORS 9.536(2); BR 10.6. The Bar bears the burden of establishing the alleged misconduct by clear and convincing evidence. BR 5.2. " 'Clear and convincing evidence' means evidence establishing that the truth of the facts asserted is highly probable." *In re Cohen*, 316 Or 657, 659, 853 P2d 286 (1993).

As explained below, we conclude after reviewing the record that, with the exception of DR 5-101(A)(1), the Bar has failed to prove by clear and convincing evidence that the accused violated the disciplinary rules at issue. We further conclude that, respecting the accused's violation of DR 5-101(A)(1), a public reprimand is the appropriate sanction.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. *Facts*

All the alleged misconduct at issue here arose from the accused's representation of the Kerbers, who were the defendants in a foreclosure action. In July 1996, Taylor, a creditor of the Kerbers, obtained a judgment of foreclosure against them that involved their residence. In December 1997, the trial court entered a supplemental judgment against Mrs. Kerber for attorney fees that Taylor had incurred. The supplemental judgment did not contain a separate money judgment, which was required before Taylor could obtain a writ of execution. Mrs. Kerber appealed from that supplemental judgment. While the supplemental judgment was pending on appeal, Taylor's lawyer, Kosydar, submitted an amended supplemental judgment to the trial court that named both Mrs. and Mr. Kerber as judgment debtors and that contained a separate money judgment.

When the accused received a copy of Kosydar's proposed amended supplemental judgment, he concluded that the trial court did not have jurisdiction to enter it, because the original supplemental judgment was pending on appeal. He filed no objection, however, and the trial court entered the amended supplemental judgment on June 13, 1997. The court then entered a writ of execution, pursuant to the amended supplemental judgment, and a sheriff's sale was scheduled for July 30, 1997.

When the trial court entered the amended supplemental judgment, and for several weeks thereafter, the accused repeatedly advised the Kerbers to challenge that judgment. The Kerbers, however, resisted, because they were trying to refinance a loan on their residence to pay off Taylor and they were fearful that further litigation would increase Kosydar's attorney fees.

On either Friday, July 25, 1997, or Monday, July 28, 1997, Mr. Kerber called the accused in either the late afternoon or early evening and instructed him to challenge the amended supplemental judgment.[1] The accused told

---

[1] At the trial panel hearing in July 2002, the accused testified that Mr. Kerber had called him on "Friday" at about 4:30 p.m, which would have been July 25, 1997.

Mr. Kerber that he would prepare the motion very early on July 29, 1997, and then would submit it later that morning at the court's regular time for hearing *ex parte* matters. The accused did not telephone Kosydar or otherwise notify her that he intended to present the motion.

On the morning of July 29, 1997, the accused drafted an *ex parte* motion to vacate the amended supplemental judgment upon the ground that the trial court had lacked jurisdiction to enter it. The phrase *"ex parte"* appeared in the caption of the motion, in compliance with the Uniform Trial Court Rules.[2] Immediately after completing the motion, the accused transmitted it by facsimile to Kosydar's office and then left for court. Kosydar's law firm received the motion at 8:55 a.m., and Kosydar personally received it at 9:30 a.m. The facsimile did not state whether the accused intended to appear personally in court to present the motion.

Sometime after 8:00 a.m. that same morning, the accused went to see the judge who was assigned to hear *ex parte* matters for the day. The accused handed his motion to the judge and, as he describes it, "kept [his] mouth shut." After reading the motion and concluding that it would be contested, the judge told the accused that the matter must be set for a hearing. The accused scheduled a hearing for the following morning. At that hearing, Kosydar told the court by telephonic appearance that she had postponed the sheriff's sale, and the court decided to reschedule the hearing in regular course. A new hearing on the accused's motion to vacate the amended supplemental judgment was rescheduled to August 14, 1997.

Meanwhile, the Kerbers continued trying to refinance a loan on their residence so that they could pay off Taylor. The accused conferred with the Kerbers' lender, who

---

However, at his deposition in May 2001, the accused stated that Mr. Kerber had called him about 12 hours before he ultimately presented his motion on the morning of July 29, 1997.

The accused also testified before the trial panel in 2002 that July 29, 1997, had been a Monday; however, July 29, 1997, in fact had been a Tuesday. The Bar has not noted that disparity, and, in any event, it is immaterial to our analysis of the disciplinary rules at issue here.

[2] UTCR 5.060(2) provides, in part, that "[a] motion for an *ex parte* order must contain the term '*ex parte*' in the caption * * *."

maintained that, before title insurance could be issued, the lender needed the exact dollar figure necessary to satisfy Taylor's judgments in writing (hereafter "final payoff figure" or "payoff figure"). The accused asked Kosydar for that figure, but she did not provide it. Consequently, on July 30, 1997, the accused filed a motion requesting, under *former* ORS 18.410 (1995),[3] *repealed by* Oregon Laws 2003, chapter 576, section 580, that the trial court enter an order setting out a final payoff figure. The accused filed that motion after conferring with a title insurance lawyer who regularly invoked that statute in similar situations.

On August 14, 1997, the trial court held a hearing, over which Judge Nachtigal presided. The hearing concerned the accused's July 29, 1997, *ex parte* motion to vacate the amended supplemental judgment; his July 30, 1997, motion for an order under *former* ORS 18.410 (1995); a motion for sanctions against the Kerbers and the accused that Kosydar had filed relating to the accused's July 29, 1997, *ex parte* motion; and a request for attorney fees that Kosydar had

---

[3] *Former* ORS 18.410 (1995) provided, in part:

"(1) This section establishes a procedure to obtain a satisfaction for a judgment for the payment of money when any person, against whom exists a judgment for the payment of money * * *, is unable to obtain a satisfaction from a judgment creditor for any reason. * * *

"* * * * *

"(2) A person described in subsection (1) of this section may request the court which gave the judgment * * * to determine the amount necessary to satisfy the judgment at a specific time in the future. To make such request, the person must do all of the following:

"(a) File a motion with the court * * *

"* * * * *

"(4) Not less than seven days after notice of hearing given to the person filing the motion and to the parties served with the motion, the court shall hear and determine the issues between the parties in a summary fashion without a jury. All the following apply to the court proceeding:

"(a) The court shall give the parties a reasonable opportunity to present evidence relevant to any factual issues in dispute as shown by the affidavits.

"(b) If the court, based on the record and sufficient evidence, is satisfied that the person making the request is entitled to relief, the court shall issue an order stating all the following:

"(A) * * * [I]f the judgment has not been satisfied in full, the specific amount that will satisfy the judgment on a date or within a period of time specified in the order.

"(B) The party or parties to whom the money is owed."

filed. Judge Nachtigal first ruled against the accused on his motion to vacate the amended supplemental judgment, stating her understanding that the trial court had authority to make the types of corrections contained in the amended supplemental judgment.

Judge Nachtigal next addressed the accused's July 30, 1997, motion for a court-ordered final payoff figure under *former* ORS 18.410 (1995). As to any ruling on that motion, the record contains conflicting statements on Judge Nachtigal's part. For example, Judge Nachtigal first suggested that the Kerbers might not have been permitted to invoke *former* ORS 18.410 (1995), because they had not yet sought to obtain a satisfaction of Taylor's judgments against them.[4] However, Judge Nachtigal then told the accused that it would not "take a rocket scientist to figure out" the final payoff figure using the judgments entered in the case. Finally, Judge Nachtigal told both parties that she could not calculate a payoff figure until any additional attorney fee issues had been resolved, stating to the accused, "I don't think you have a [*former*] ORS 18.410 [(1995)] problem at all yet. You may, but you don't have it."[5]

Judge Nachtigal then addressed Kosydar's motion for sanctions respecting the accused's *ex parte* motion to vacate the amended supplemental judgment. Judge Nachtigal and the accused engaged in the following colloquy:

"[THE ACCUSED]: Your Honor, my notice to opposing counsel is of record. I've got the fax transmittal. She [was] there. It was before the hearing. * * *

"THE COURT: How long before the hearing?

---

[4] Before Judge Nachtigal, Kosydar had argued that the statutory wording that a judgment debtor be "unable to obtain a satisfaction from a judgment creditor," *former* ORS 18.410(1) (1995), required a judgment debtor to make payment on the judgment before the debtor could invoke the statute (which, apparently, the Kerbers had not done). As discussed later in this opinion, the Bar has not made a similar statutory argument in this proceeding.

[5] Judge Nachtigal said nothing further to the accused at the August 14, 1997, hearing, respecting his July 30, 1997, motion for a court-ordered final payoff figure, although she and the parties ultimately agreed upon a method of calculating the amount due at that point in time, not including Kosydar's pending attorney fee request. The record contains no additional written communication from Judge Nachtigal to the accused regarding his motion for a court-ordered final payoff figure.

"[THE ACCUSED]: About a half an hour.

"THE COURT: Half an hour before the hearing? Do you think that's adequate notice?

"[THE ACCUSED]: * * * Your Honor, I was doing my best to get—

"THE COURT: Whatever gave you the idea that you could come in and do that ex parte in the first place?

"[THE ACCUSED]: I was given to—by a desperation—

"THE COURT: Desperation doesn't cause us to do things that there's no legal basis to do. What gave you the right to go in, ex parte, and try to set aside a judgment with a half an hour notice when you know the other side's represented?

"* * * * *

"* * * I mean where—where in any of the rules does it say you can do that?

"[THE ACCUSED]: I didn't know it was forbidden.

"THE COURT: I'm going to take that as a[n] answer under pressure. That's an affront to the Court. * * * Nobody is going to do anything ex parte on a valid judgment on a case like this. Nobody. A half an hour notice on that kind of a matter is, I believe, unethical, at a minimum. It is not reasonable notice. You can't even get an ex parte.

"This file is full of at the last minute your client[s] doing everything in their power to stop the judgment that's been entered. At some point[,] it simply has to stop. * * *

"This is an appropriate case for sanctions. There never should have been an effort to try to set it aside ex parte."

Judge Nachtigal later entered a monetary judgment awarding sanctions against both the Kerbers and the accused under ORCP 17 D.[6] The judgment stated that the accused had presented his July 29, 1997, *ex parte* motion to vacate the

---

[6] ORCP 17 D(1) provides that a court may impose sanctions against a person or a party who is found to have made a false certification under ORCP 17 C. ORCP 17 C, in turn, provides that, in submitting a motion, a lawyer certifies that the motion "is not being presented for any improper purpose, such as to harass or to cause unnecessary delay," ORCP 17 C(2), and that the legal position set out in the motion is "warranted by existing law," ORCP 17 C(3).

amended supplemental judgment "for an improper purpose, specifically[,] to delay and hinder [the] scheduled foreclosure sale." The sheriff's sale was rescheduled to August 25, 1997.

On August 19, 1997, the accused wrote to Judge Nachtigal, requesting that she issue an order granting the Kerbers' earlier motion under *former* ORS 18.410 (1995) to obtain a final payoff figure. The accused wrote:

"It is critical that you make the necessary findings to complete the order and that you sign the order. Until you file the order, no title company will calculate and determine the amount of money due Mr. Taylor under his judgments in light of Mr. Taylor's refusal to provide reasonable payoff figures.

"Once you file the order, Mr. Kerber can and will obtain the necessary refinancing to pay off the judgments in the amounts you determine.

"Time is of the essence. The sheriff's sale is now scheduled for Monday, August 25, 1997[,] at 10:00 a.m."

The accused thereafter transmitted a letter by facsimile to Kosydar asking that she supply a final payoff figure before 5:00 p.m. on Friday, August 22, 1997, the last business day before the scheduled sheriff's sale. Neither Judge Nachtigal nor Kosydar responded to the accused's letters.

At 5:00 p.m. on Friday, August 22, 1997, having heard from neither Judge Nachtigal nor Kosydar, the accused drafted an *ex parte* motion to stay the sheriff's sale pending entry of an order granting his earlier motion under *former* ORS 18.410 (1995). He transmitted a copy of his *ex parte* motion to Kosydar by facsimile at 5:14 p.m. that same day. As with his first *ex parte* motion, the phrase "*ex parte*" appeared in the caption; however, the facsimile to Kosydar did not state whether the accused intended to appear personally in court to present the motion.

At 8:45 a.m. on Monday, August 25, 1997, the accused went to the chambers of Judge Alexander, who was assigned to hear *ex parte* matters for the day. The accused handed Judge Alexander his motion and told him that Judge Nachtigal had made a ruling on the case. Judge Alexander asked if Judge Nachtigal should hear the motion, and the

accused responded affirmatively. Judge Alexander called Judge Nachtigal's chambers, but Judge Nachtigal was not available. Judge Alexander then read the motion and granted the stay; however, he did not rule on the merits.

Kosydar thereafter moved to set aside the stay that Judge Alexander had granted and also moved for additional sanctions against the Kerbers and the accused. Judge Nachtigal held a hearing on those motions on October 1, 1997. At that hearing, the accused repeated his assertion that, under *former* ORS 18.410 (1995), the court must issue an order setting out a final payoff figure; however, Judge Nachtigal denied his motion, stating that she was "not required to do the math." As to Kosydar's motion for sanctions, Judge Nachtigal stated:

> "Well, when I heard that a stay had been issued under almost identical facts to the previous stay that had been issued that I sanctioned you for, I was speechless. I'm not very often speechless. I absolutely couldn't believe that as an officer of the court you did exactly what I had told you not to do. That you did precisely what I had sanctioned you for before. I was dumbfounded that you would do that.

> "* * * * *

> "I don't know how much plainer I could have made it at the last hearing that I found your behavior of faxing after hours for a[n] ex parte hearing the very next morning, knowing that there was an objection, knowing that there was no way that the attorney would get the fax or be able to respond, and knowing that the other side vehemently objected to your position—. And on top of it there was no basis for your stay, none. I was amazed to say the least.

> "I am going to sanction you. * * *"

Judge Nachtigal later entered a second monetary judgment awarding sanctions against the Kerbers and the accused. That judgment stated that the accused's August 25, 1997, *ex parte* motion had been presented "for an improper purpose, including to delay foreclosure."[7]

---

[7] The accused appealed both sanction judgments to the Court of Appeals, and that court affirmed both judgments. *Taylor v. Kerber*, 171 Or App 301, 15 P3d 93 (2000). The Court of Appeals concluded that, as to both the accused's *ex parte* motions, evidence in the record before it supported Judge Nachtigal's factual find-

The Kerbers' residence subsequently was sold; however, the sale proceeds were insufficient to pay all Taylor's judgments against the Kerbers. The interest rate on the Kerber's principal balance to Taylor was 13.89 percent; by contrast, the interest rate on the post-judgment interest on that balance, as well as on a cost judgment, two attorney fee judgments, and the two sanction judgments, was nine percent.

The accused filed a motion to determine which of Taylor's judgments had been satisfied as a result of the foreclosure, including a request that the sanction judgments, for which he was jointly liable with the Kerbers, be paid in full. Before the hearing on that motion, Kosydar suggested to the accused by letter that his motion presented a conflict of interest because he would benefit financially if the sanction judgments—the only judgments for which he also was liable— were satisfied before the principal judgment, whereas the Kerbers would benefit financially if the principal judgment— the judgment with the highest interest rate—was satisfied before the sanction judgments. The accused disagreed that a conflict of interest existed. In his view, Taylor could not collect against the Kerbers on the principal judgment, because he had exhausted his security in the Kerbers' residence through the foreclosure.

After receiving Kosydar's letter, the accused transmitted it by facsimile to the Kerbers and discussed it with them. The accused told the Kerbers, as he had numerous times over the course of the litigation, that, in his view, Taylor could not collect on the principal judgment and, therefore, that the higher interest rate on that judgment was immaterial. He further told the Kerbers that, if the court denied his request respecting satisfaction of the sanction judgments, then he personally would pay those judgments. The Kerbers agreed with that course of action.

In May 1998, Judge Nachtigal held a hearing on the accused's motion regarding application of the sale proceeds. Judge Nachtigal raised the issue of a conflict of interest, and

---

ings that the accused had acted with an "improper purpose" under ORCP 17 C(2). *Id.* at 309-10. The court further concluded that Judge Nachtigal had not abused her discretion in imposing sanctions. *Id.*

the accused responded that, in his view, no conflict existed. Judge Nachtigal then denied the accused's request respecting satisfaction of the sanction judgments, and the accused ultimately paid those judgments in their entirety.

## B. *Bar's Complaint and Trial Panel Proceeding*

In March 2002, the Bar filed an Amended Formal Complaint against the accused, alleging that he had violated DR 7-102(A)(1) and (2), DR 7-106(C)(7), DR 7-110(B)(2) and (3), and DR 1-102(A)(4), both when he had presented his first *ex parte* motion seeking to vacate the amended supplemental judgment and when he had presented his second *ex parte* motion seeking to delay the sheriff's sale pending entry of an order under *former* ORS 18.410 (1995). The Bar's amended complaint further alleged that the accused had violated DR 5-101(A)(1) and DR 7-102(A)(2) when he requested satisfaction of the sanction judgments without complying with the requirements respecting full disclosure of a conflict of interest.

The trial panel held a hearing later in 2002. The Bar introduced a transcript of the accused's deposition from May 2001 and several exhibits, largely consisting of transcripts and court orders from the proceedings before Judge Nachtigal; however, the Bar introduced no witness testimony. The accused introduced the testimony of three witnesses and also testified at length in his own behalf. Five months after the completion of the hearing, the trial panel issued an opinion that determined that the accused had committed all the alleged violations respecting his second *ex parte* motion and had violated DR 1-102(A)(4), DR 7-102(A)(1), and DR 7-110(B) respecting his first *ex parte* motion. The trial panel further determined that the accused had violated DR 5-101(A)(1), respecting his request to satisfy the sanction judgments.[8] Finally, the trial panel imposed a 90-day suspension.

---

[8] The trial panel's opinion does not mention the Bar's additional allegation that the accused violated DR 7-102(A)(2) (prohibiting knowingly advancing claim unwarranted under existing law) when he requested satisfaction of the sanction judgments.

On review, the accused argues that his conduct in representing the Kerbers did not violate any disciplinary rules; alternatively, he asks this court to impose only a public reprimand. The Bar, in turn, argues that this court should reach the same conclusions as the trial panel respecting both the alleged violations and the appropriate sanction.[9]

## II. ALLEGED DISCIPLINARY RULE VIOLATIONS

### A. *DR 7-102(A)(1) and (2)*

DR 7-102(A) provides, in part:

"In the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not:

"(1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of the lawyer's client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

"(2) Knowingly advance a claim or defense that is unwarranted under existing law except that the lawyer may advance such claim or defense if it can be supported by good faith argument for an extension, modification or reversal of existing law."

As noted above, the trial panel concluded that the accused had violated DR 7-102(A)(1) when he had presented both his *ex parte* motions because those motions had served the sole purpose of harassing Taylor. The trial panel further concluded that the accused had violated DR 7-102(A)(2) when he had presented his second *ex parte* motion because Judge Nachtigal already had denied his first *ex parte* motion, which effectively had sought to delay the sheriff's sale. Before the trial panel and again on review, the accused argues that he

---

[9] At the outset of its brief, the Bar generally argues that this court should conclude that the accused violated all the disciplinary rules at issue in its amended complaint respecting the accused's two *ex parte* motions (as well as those respecting any purported conflict of interest). However, in each section of its brief pertaining to each individual disciplinary rule, the Bar argues only that this court should reach the same conclusions as the trial panel; it offers no additional argument supporting its initial allegations under DR 7-102(A)(2) and DR 7-106(C)(7)—relating to the accused's first *ex parte* motion—as to which the trial panel concluded that no violations occurred. Given that lack of argument on the Bar's part, we do not address those additional allegations in this opinion.

violated neither DR 7-102(A)(1) nor (2) because his *ex parte* motions did not "serve merely to harass" Taylor and because his second *ex parte* motion was warranted under existing law. The Bar, by contrast, argues that the trial panel's analysis was correct.

We begin with the Bar's allegations under DR 7-102(A)(1). As noted above, that rule prohibits a lawyer, among other things, from taking action in a client's behalf when the lawyer knows or when it is obvious "that such action *would serve merely to harass* or maliciously injure another." (Emphasis added.) This court has clarified that, in using the word "merely," that rule prohibits conduct aimed solely toward harassing or maliciously injuring another, rather than conduct aimed toward serving some legitimate purpose that happens to harass or injure another. *See In re Hockett*, 303 Or 150, 160, 734 P2d 877 (1987) (accused lawyer did not violate DR 7-102(A)(1), because, although lawyer's conduct in fact harassed and injured his clients' creditors, "that was not his sole aim"); *In re Hopp*, 291 Or 697, 700, 634 P2d 238 (1981) (accused lawyer violated DR 7-102(A)(1) when he admittedly had "no other purpose" than to harass opposing counsel).

Because this court's inquiry under DR 7-102(A)(1) can involve the question whether the accused lawyer advanced a legally unwarranted claim or defense, thereby implicating conduct that DR 7-102(A)(2) prohibits, we take this opportunity to clarify the interplay between those inquiries. Simply stated, this court's inquiry under DR 7-102(A)(1)—unlike an inquiry under DR 7-102(A)(2)—generally focuses upon the accused lawyer's motivation in taking a particular action, rather than upon the legitimacy of the legal position asserted. For example, if the Bar proves by clear and convincing evidence that an accused lawyer sought *merely* to harass or maliciously injure another in advancing a legal position, then the Bar has proved a violation of DR 7-102(A)(1), regardless of the legitimacy of the legal basis for the lawyer's action. *See In re White*, 311 Or 573, 578, 815 P2d 1257 (1991) (accused lawyer violated DR 7-102(A)(1) when he admittedly filed numerous actions in client's behalf to cause particular defendant "as much grief and expense * * * as was humanly possible"; not all such actions legally unwarranted).

However, if the Bar proves by clear and convincing evidence that *no* legitimate legal basis for the action in question existed, then that fact would provide evidence that the lawyer's sole motivation had been to harass or maliciously injure another (rather than to pursue a legitimate legal position). *See id.* at 579-81 (court's conclusion that accused lawyer knowingly had filed legally unwarranted claims provided basis for conclusion that lawyer had filed those particular claims merely to harass another); *In re Glass*, 309 Or 218, 223-24, 784 P2d 1094 (1990) (accused lawyer who engaged in prohibited misrepresentation to advance client's interests might not have violated DR 7-102(A)(1) if he had engaged in permissible action intended to serve legitimate purpose).

■ We turn to the question whether the accused presented his first *ex parte* motion (seeking to vacate the amended supplemental judgment for lack of jurisdiction) merely to harass Taylor. In doing so, we first emphasize that the Bar does not argue in support of its DR 7-102(A)(1) allegation—let alone attempt to prove—that the accused had no legal basis to argue that the trial court had been without jurisdiction to enter the amended supplemental judgment. Because the Bar neither has made that argument nor has presented any evidence in that regard, we do not consider the legal legitimacy of the accused's first *ex parte* motion in our determination whether he presented that motion merely to harass Taylor.

Turning to the contents of the record, the accused testified at his deposition that his sole purpose in presenting his first *ex parte* motion, which, if successful, would have stopped the foreclosure process, was to obtain time for the Kerbers to complete refinancing. Nothing in the record contradicts that testimony; indeed, the accused's additional uncontroverted testimony that the Kerbers had resisted challenging the amended supplemental judgment while they sought refinancing and then had acquiesced shortly before the scheduled sale supports the accused's contention that his purpose in presenting his first *ex parte* motion was to obtain additional time for the Kerbers to satisfy the judgments, not to harass Taylor. Consequently, as in *Hockett*, 303 Or at 160, although the accused's motion doubtlessly caused significant inconvenience to Taylor, the Bar has not proved by clear and

convincing evidence that the motion "serve[d] merely to harass" Taylor within the prohibition set out in DR 7-102(A)(1). *Compare White*, 311 Or at 578 (accused lawyer violated DR 7-102(A)(1) when he purposefully acted to cause another person significant grief and expense).

■ We turn to the Bar's allegation under DR 7-102(A)(1) involving the accused's second *ex parte* motion (seeking to delay the sheriff's sale pending entry of an order under *former* ORS 18.410 (1995)). As with the accused's first *ex parte* motion, we first emphasize that the Bar does not argue, to support its allegation under DR 7-102(A)(1), that the accused had no legal basis to file his second *ex parte* motion. In any event, we conclude below—in connection with the Bar's allegation under DR 7-102(A)(2)—that the Bar has not proved by clear and convincing evidence that the accused's second *ex parte* motion was unwarranted under existing law. We proceed, then, to determine whether any evidence in the record demonstrates that the accused presented his second *ex parte* motion merely to harass Taylor.

As with the accused's first *ex parte* motion, the record demonstrates that the accused presented his second *ex parte* motion hoping to delay the sheriff's sale for the purpose of obtaining time for the Kerbers to refinance, not to harass Taylor. Indeed, the accused presented his second *ex parte* motion to obtain that objective only after repeated efforts to obtain a final payoff figure from both Judge Nachtigal and Kosydar had failed. In light of that evidence, the Bar has not proved by clear and convincing evidence that the accused presented his second *ex parte* motion merely to harass Taylor in violation of DR 7-102(A)(1).

For purposes of clarification, we briefly discuss the trial panel's contrary conclusions under DR 7-102(A)(1), respecting both the accused's *ex parte* motions. As to those alleged violations, the trial panel wrote:

> "The Accused filed two ex parte motions with the purpose of delaying the court[-]ordered sheriff's sale. In response to [Judge Nachtigal's] question at the time the Accused was ordered to appear for his first sanction hearing, the Accused stated that he filed the ex parte motion because his clients were 'desperate' to save their house from the sheriff's sale.

The Accused's course of conduct served the sole purpose of harassing the judgment creditor."

The trial panel's opinion misses the mark in two respects. First, the trial panel in part relied upon the accused's statement at the August 14, 1997, hearing that he had been "given to—by a desperation" in presenting his first *ex parte* motion to conclude that he had acted in violation of DR 7-102(A)(1). However, that statement on the accused's part did not establish by clear and convincing evidence that he had presented his first *ex parte* motion merely to harass Taylor. At the hearing before Judge Nachtigal and at his deposition in this proceeding, the accused elaborated that the Kerbers had been desperate to prevent their residence from being sold, which is consistent with and supported by the uncontroverted evidence that the Kerbers had sought to secure refinancing until the late hours before the scheduled sale. The fact that his clients had been desperate to prevent the sale does not justify the trial panel's conclusion that the accused had acted merely to harass Taylor when he sought to protect his clients' interests.

Second, the trial panel appears to have equated the accused's motivation in delaying the sheriff's sale with the prohibited purpose of merely harassing Taylor. As we have explained, however, the record demonstrates that, as to both his *ex parte* motions, the accused had legitimate motivations for seeking to delay the sheriff's sale—that is, to obtain time for the Kerbers to complete refinancing (and, specifically as to the second *ex parte* motion, to obtain a final payoff figure after earlier attempts to do so had failed). Because the Bar has not proved that the accused presented his *ex parte* motions "merely to harass" Taylor, it has failed to prove that the accused violated DR 7-102(A)(1).[10]

---

[10] As noted earlier, 337 Or at 192-93 n 7, the Court of Appeals in *Taylor*, 171 Or App at 309-10, determined that evidence in the record before it had supported Judge Nachtigal's findings that, in presenting both his *ex parte* motions, the accused had acted with an "improper purpose" under ORCP 17 C(2), specifically, to delay *unnecessarily* the sheriff's sale. The trial panel appears to have relied upon *Taylor*, at least in part, in concluding that the accused violated DR 7-102(A)(1).

Our analysis in this proceeding, however, differs in three significant respects from the Court of Appeals decision in *Taylor*: (1) different records are subject to judicial review; (2) different rules (with different elements) are at issue; and (3) different burdens of proof apply to the legal issues involved. When viewed in its

■ We turn to the Bar's allegation that, in presenting his second *ex parte* motion, the accused violated DR 7-102(A)(2), which prohibits "[k]nowingly advanc[ing] a claim or defense that is unwarranted under existing law."[11] We first clarify the contents of the record and the specifics of the Bar's argument, as important background to the discussion that follows.

For purposes of our analysis here, the following aspects of the record are significant. First, in response to the accused's *first ex parte* motion (to vacate the amended supplemental judgment), Judge Nachtigal told the accused that he had had no legal basis to file *that* motion *ex parte* and with eleventh-hour notice to Kosydar, and that his clients must stop their efforts to delay the sheriff's sale. Second, in response to the accused's July 30, 1997, motion under *former* ORS 18.410 (1995), the record is unclear as to the precise basis for Judge Nachtigal's refusal to provide a final payoff figure, and it also is unclear as to whether Judge Nachtigal in fact made any ruling on the motion at all. Finally, in response to the accused's second *ex parte* motion, Judge Nachtigal sanctioned the accused for presenting that motion *ex parte* shortly after she had sanctioned him for similar conduct respecting his first *ex parte* motion, which had involved a wholly different legal issue. That is, Judge Nachtigal sanctioned the accused for again presenting a motion *ex parte* to delay the impending sheriff's sale with eleventh-hour notice to Kosydar. Nothing in the record suggests that, as to the accused's second *ex parte* motion, Judge Nachtigal sanctioned the accused for continuing to press the legal merits of his argument under *former* ORS 18.410 (1995) after she purportedly already had ruled against him on the merits of that argument. (Indeed, as discussed above, it is unclear whether she had ruled on the merits of his July 30, 1997, motion at all.)

---

entirety, the record before us in this proceeding does not establish by clear and convincing evidence that the accused presented his *ex parte* motions merely to harass Taylor.

[11] As noted earlier, 337 Or at 195 n 9, 197, the Bar does *not* argue on review that the accused violated DR 7-102(A)(2) in presenting his *first ex parte* motion; rather, respecting that rule, the Bar focuses only upon his second *ex parte* motion.

We turn to the Bar's argument under DR 7-102(A)(2) respecting the accused's second *ex parte* motion, although we begin by clarifying that which the Bar does *not* argue. First, the Bar does not argue that the accused improperly invoked the statutory procedure set out in *former* ORS 18.410 (1995) for obtaining a final payoff figure in his second *ex parte* motion. That is, in arguing that the accused "[k]nowingly advance[d] a claim or defense * * * unwarranted under existing law," the Bar does not argue that *former* ORS 18.410 (1995) provided no legitimate legal basis for the accused's second *ex parte* motion (for example, that the Kerbers had not satisfied a requirement for invoking that statute). After reviewing the statute, we similarly conclude, without further discussion, that it provided the accused with a colorable legal basis for his continued requests for a court-ordered payoff figure, including the request set out in his second *ex parte* motion. We further note as significant that the accused clearly thought that his second *ex parte* motion properly invoked that statute. In short, as to the legal basis underlying the accused's second *ex parte* motion, the Bar has not proved that the accused "[k]nowingly advance[d] a claim or defense * * * unwarranted under existing law." *See generally In re Dugger*, 334 Or 602, 611, 54 P3d 595 (2002) (because accused lawyer acted in conformance with particular statute, he did not advance claim unwarranted under existing law in violation of DR 7-102(A)(2)).

The Bar also does not argue that, in filing his second *ex parte* motion, the accused improperly continued to press his argument under *former* ORS 18.410 (1995) after Judge Nachtigal already had ruled on the merits by denying his July 30, 1997, motion. That is, in arguing that the accused "[k]nowingly advance[d] a claim or defense * * * unwarranted under existing law" under DR 7-102(A)(2), the Bar does not argue that the accused improperly pursued a legal argument that the trial court already had rejected on the merits. Further, as explained above, the record is unclear in any event as to (1) whether Judge Nachtigal in fact ruled against the accused on the merits of his July 30, 1997, motion under *former* ORS 18.410 (1995); or (2) whether she merely declined to provide a final payoff figure.

We turn, then, to the argument under DR 7-102(A)(2) that the Bar *does* make, which is that the accused "[k]nowingly advance[d] a claim or defense * * * unwarranted under existing law" because he presented his second *ex parte* motion on an *ex parte* basis eight days after Judge Nachtigal had sanctioned him for presenting a similar, eleventh-hour *ex parte* motion. Specifically, the Bar argues that, after Judge Nachtigal had sanctioned the accused for presenting a motion *ex parte* with the improper purpose of delaying the sheriff's sale (as she had characterized his first *ex parte* motion), he was not permitted to present another motion to delay the sheriff's sale on an *ex parte* basis. The trial panel agreed with that contention.

The Bar essentially challenges the ultimate objective of the accused's second *ex parte* motion (*i.e.*, delay of the sheriff's sale), as well as the form in which the accused presented that motion (*i.e.*, *ex parte*). However, as discussed above, the Bar does not challenge the legal underpinnings of that motion—specifically, the procedure set out under *former* ORS 18.410 (1995). That is, the Bar's complaint under DR 7-102(A)(2) respecting the accused's second *ex parte* motion is that the accused *presented* that motion *ex parte* hoping to delay the sheriff's sale, not that the motion itself was legally unwarranted or that the accused improperly presented it because Judge Nachtigal already had ruled on the merits. The Bar's particular argument respecting the objective of the accused's motion and its *ex parte* nature is more appropriately addressed to other allegations that it has made against the accused, most notably, its allegations under DR 1-102(A)(4) (prejudice to administration of justice). *See In re Magar*, 335 Or 306, 313-14, 66 P3d 1014 (2003) (tenor of Bar's argument respecting accused lawyer's repeated efforts to undo property transfer more appropriately addressed to harassment claim under DR 7-102(A)(1) than to "legally unwarranted" claim under DR 7-102(A)(2)). We conclude that the Bar has not proved by clear and convincing evidence that the accused violated DR 7-102(A)(2) when he presented his second *ex parte* motion.

B. *DR 7-106(C)(7)*

DR 7-106(C) provides, in part:

"In appearing in the lawyer's professional capacity before a tribunal, a lawyer shall not:

"\* \* \* \* \*

"(7) Intentionally or habitually violate any established rule of procedure or of evidence."

The Bar's amended complaint alleged that the accused violated DR 7-106(C)(7) when he presented both his *ex parte* motions; the trial panel concluded that the accused had violated that rule respecting his second *ex parte* motion. On review, the Bar specifically contends, as the trial panel concluded, that the accused intentionally violated ORCP 17 C, which provides that, by signing or submitting a motion, a lawyer certifies that that motion "is not being presented for any improper purpose, such as to harass or to cause unnecessary delay," ORCP 17 C(2), and that the legal position set out in the motion is "warranted by existing law," ORCP 17 C(3). In challenging the trial panel's determination respecting his second *ex parte* motion, the accused argues, first, that the Bar's complaint was insufficient to notify him as to the "established rule of procedure," DR 7-106(C)(7), that he was alleged to have violated. Alternatively, the accused argues that he did not act intentionally. For the reasons set out below, we agree with the accused's first contention, and we therefore dismiss the Bar's allegation under DR 7-106(C)(7).

As relevant here, the Bar's amended complaint set out the following allegations. In its first cause of complaint, which pertained to the accused's first *ex parte* motion, the Bar alleged that (1) the trial court had found that the accused had presented that motion for the purpose of delay and hindering the sheriff's sale; (2) the court had sanctioned the accused; and (3) the accused intentionally had violated an established rule of procedure. In its second cause of complaint, which pertained to the accused's second *ex parte* motion, the Bar realleged the foregoing allegations and further alleged that (1) the trial court had found that the accused intentionally had appeared *ex parte* and presented a motion for an improper purpose that was not warranted by existing law; (2) the court again had sanctioned the accused; and (3) the "aforesaid conduct" had violated DR 7-106(C)(7), among numerous other rules. The Bar's complaint did not include

any reference to any particular procedural rule that the accused's conduct allegedly had violated.

In his brief before the trial panel and again in his written closing argument, the accused noted that the Bar's amended complaint had been silent as to which rule he allegedly had violated, and he asserted that no written rule had prohibited him from presenting his second motion on an *ex parte* basis. The accused further asserted that "[d]ue process requires that [he] be advised of precisely which rule or procedure he is accused of intentionally violating." The accused repeats that due process argument on review, asserting, correctly, that "[t]he first specification of such a rule came in the Trial Panel Decision: ORCP * * * 17."

We need not address the accused's constitutional due process argument, because we conclude that the Bar's complaint was insufficient under the Bar's own rules of procedure. *See Leo v. Keisling*, 327 Or 556, 562, 964 P2d 1023 (1998) (court ordinarily does not decide constitutional issues if adequate subconstitutional basis exists for decision). BR 4.1(c) provides, in part:

> "A formal complaint shall * * * set forth succinctly the acts or omissions of the accused, including the specific statutes or disciplinary rules violated, so as to enable the accused to know the nature of the charge or charges against the accused. * * *"

The wording of that rule imposes a duty upon the Bar to "set forth succinctly the acts or omissions of the accused" lawyer that gave rise to an alleged disciplinary rule violation. In the context of an allegation under DR 7-106(C)(7), that duty encompasses the obligation to allege with specificity the "established rule of procedure or of evidence" that, in the Bar's view, the accused lawyer intentionally or habitually violated. Such an obligation ensures that the particular allegation "enable[s] the accused [lawyer] to know the nature of the charge or charges against [him or her]," as BR 4.1(c) requires.

Here, the Bar's amended complaint set out the disciplinary rule at issue, DR 7-106(C)(7); however, it did not specify which procedural rule provided the basis for the

alleged DR 7-106(C)(7) violation. Moreover, we can glean nothing from the lengthy, collective description of the accused's conduct in the complaint that clearly identifies which particular rule was at issue. Indeed, in answering the complaint and in defending himself before the trial panel, the accused apparently thought that the Bar's allegation under DR 7-106(C)(7) pertained to *ex parte* motion practice; by contrast, the trial panel ultimately concluded that the accused intentionally had violated ORCP 17 C(3).[12] In sum, we conclude that, respecting the alleged violation of DR 7-106(C)(7) relating to the accused's second *ex parte* motion, the Bar's amended complaint did not "set forth succinctly the acts or omissions of the accused," as BR 4.1(c) requires. *Compare In re Spencer*, 335 Or 71, 79-80, 58 P3d 228 (2002) (Bar's complaint satisfied BR 4.1(c), because contested wording was not necessary to prove violation of disciplinary rule at issue). We therefore dismiss that allegation.

C. *DR 7-110(B)(1)-(4)*

DR 7-110(B) provides, in part:

"In an adversary proceeding, a lawyer shall not communicate, or cause another to communicate, as to the merits of the cause with a judge or an official before whom the proceeding is pending except:

"(1) In the course of official proceedings in the cause.

"(2) In writing if the lawyer promptly delivers a copy of the writing to opposing counsel * * *.

"(3) Orally upon adequate notice to opposing counsel * * *.

"(4) As otherwise authorized by law or by Judicial Rule 2 of the Code of Judicial Conduct."

In its amended complaint, the Bar alleged that the accused had violated DR 7-110(B)(2) and (3) when he had presented both his *ex parte* motions. Similarly, the Bar argues on review

---

[12] As noted above, the Bar's amended complaint generally alleged, among many other things, that the trial court had found that the accused had presented his second *ex parte* motion with an "improper purpose" and that the motion had not been "warranted by existing law." Although the Bar's use of those terms could have pointed the accused to ORCP 17 C(2) and (3), those terms equally could have been understood as referring to conduct that DR 7-102(A)(1) and (2) proscribe.

that the accused failed to give Kosydar either "prompt[ ]" or "adequate" notice when he notified her by facsimile at the eleventh hour. The trial panel appears to have agreed with the Bar.[13] As to DR 7-110(B)(2), the accused argues that he satisfied the "prompt[ ] deliver[y]" requirement of that rule when he transmitted copies of his *ex parte* motions to Kosydar by facsimile immediately upon completing them. As to DR 7-110(B)(3), the accused argues that that rule is inapplicable to his *ex parte* motions because those motions constituted written—not oral—communications with the trial court.[14]

We begin with DR 7-110(B)(2), which provides that a lawyer may communicate in writing as to the merits of the cause to the judge before whom the proceeding is pending, "if the lawyer *promptly delivers a copy of the writing* to opposing counsel." (Emphasis added.) Viewed more narrowly, the rule requires "prompt[ ] deliver[y]" of "*the* writing" (emphasis added) to opposing counsel. Here, the record establishes that the accused transmitted to Kosydar by facsimile copies of both his *ex parte* motions—the writings at issue that constituted communications with the trial court as to the merits of the cause—immediately upon completing them. He therefore

---

[13] The trial panel wrote:

"* * * *DR 7-110(B)(2)* of the Code of Professional Responsibility. The Accused chose a course of conduct which permitted him to communicate as to the merits of his cause with a judge before whom the proceeding was pending with *inadequate notice* to the opposing party's counsel. The court agreed with the opposing party's counsel that *the notice was inadequate*."

(Emphasis added.) As can be seen, the trial panel opinion *cited* DR 7-110(B)(2) (but did not cite DR 7-110(B)(3)); however, it *quoted* from DR 7-110(B)(3) in its reasoning, in referring to "inadequate notice" (but did not quote from DR 7-110(B)(2), regarding "prompt[ ] deliver[y]").

[14] We note that this court's decision in *In re Bell*, 294 Or 202, 655 P2d 569 (1982), presented a factual scenario involving DR 7-110(B) similar to the facts at issue here. *See id.* at 205-08 (accused lawyer prepared decree that he intended to leave for judge's signature, without notifying opposing counsel when he knew that counsel would object; lawyer unexpectedly encountered judge at courthouse, which led to discussion of proposed decree and judge's signature). However, because that case involved only the issue of the appropriate sanction, the court did not address in any detail the particular requirements of (or differences between) DR 7-110(B)(2) and (3). Further, because that case—unlike the facts involved in this proceeding—involved *no* notice to opposing counsel, the lawyer's conduct undoubtedly fell within at least some of the prohibitions set out in DR 7-110(B).

satisfied the "prompt[ ] deliver[y]" requirement set out in DR 7-110(B)(2).

The Bar argues that the accused's eleventh-hour facsimile transmissions to Kosydar violated DR 7-110(B)(2) because they contravened the purpose of DR 7-110(B), which is "to prevent the effect or the appearance of granting undue advantage to one party." *In re Smith*, 295 Or 755, 759, 670 P2d 1018 (1983) (internal quotation marks and ellipses omitted). The Bar is correct that the accused's eleventh-hour transmissions of his *ex parte* motions to Kosydar (*i.e.*, his "deliver[y]" of the written communications at issue) likely contravened that general purpose. However, contrary to the Bar's assertion, the wording of DR 7-110(B)(2) does not require prompt *notice* of a written communication on the merits with a judge; rather, it requires prompt *delivery* of a written communication of that type. At bottom, the Bar essentially complains of an aspect of the accused's conduct that DR 7-110(B)(2) does not prohibit.[15]

We turn to DR 7-110(B)(3), which requires "adequate notice" to opposing counsel of an oral communication with a judge as to the merits of a cause. The Bar contended at oral argument before this court that, although the accused technically had submitted both his *ex parte* motions in written form, those motions properly should be viewed as oral communications because they had not consisted of the type of communication that a lawyer ordinarily would submit in writing and deliver to a judge via messenger, to be acted upon in due course. Rather, the Bar argues, the accused purposely crafted his emergency motions in writing, so as to avoid the "adequate notice" requirement of DR 7-110(B)(3), but then submitted them personally to the trial court for immediate action.[16] In the Bar's view, the accused cannot rely upon the

---

[15] Stated another way, the Bar relies upon the general purpose of DR 7-110(B), rather than the specific wording of DR 7-110(B)(2), to argue that the accused violated DR 7-110(B)(2). However, that proposition stands in contrast to the standard that this court applies to accused lawyers. *See generally In re Lawrence*, 332 Or 502, 512, 31 P3d 1078 (2001) (notwithstanding accused lawyer's argument that he complied with "spirit" of rules regarding full disclosure of conflict of interest, his conduct needed to conform with wording of rules).

[16] The record supports the Bar's contention that, by crafting his motions in writing, the accused sought to avoid the "adequate notice" requirement.

form of his motions to circumvent the disciplinary rules, and, to avoid that result, this court should treat the accused's written *ex parte* motions as if they had been oral motions.

As with the alleged violations of DR 7-110(B)(2), the Bar's argument respecting DR 7-110(B)(3) misses the mark. Although we agree that a lawyer purposefully should not seek to circumvent the disciplinary rules, and although we further agree that the accused's eleventh-hour facsimile transmissions respecting both his *ex parte* motions were insufficient to provide meaningful notice to Kosydar, we cannot disregard the fact that the accused submitted his *ex parte* communications to the court as to the merits of the cause in writing, not orally. That form of communication falls within the "prompt[ ] deliver[y]" requirement of DR 7-110(B)(2)— which the accused satisfied by immediately transmitting his motions by facsimile to Kosydar upon completing them—not the "adequate notice" requirement of DR 7-110(B)(3).

We acknowledge that this proceeding presents an unusual factual scenario in that, notwithstanding the accused's eleventh-hour notice to Kosydar of both his *ex parte* motions, the form of those motions effectively assisted the accused in avoiding violations of either DR 7-110(B)(2) or (3). We further note that, in the context of the facts at issue here, we generally view the accused's conduct as unprofessional, because the accused crafted his *ex parte* motions so as to conform with DR 7-110(B)(2) while avoiding the reach of DR 7-110(B)(3) and because his actions effectively denied Kosydar the opportunity to prepare any meaningful response. Nevertheless, to constitute *unethical* conduct, the accused's actions must have contravened the wording of the disciplinary rules at issue, and, as discussed, the Bar has not proved that the accused's actions did so.

## D. *DR 1-102(A)(4)*

DR 1-102(A) provides, in part:

"It is professional misconduct for a lawyer to:

"(4) Engage in conduct that is prejudicial to the administration of justice."

The Bar alleged, and the trial panel agreed, that, in presenting both his *ex parte* motions, the accused engaged in conduct prejudicial to the administration of justice. The accused responds that his conduct was within the bounds of permissible representation and that the "administration of justice" included the Kerbers' "rights to pay the judgments by refinancing their home, to know the certain judgment amounts necessary for satisfaction, and to have all such judgments entered by a court exercising lawful jurisdiction."

■ This court's first inquiry when evaluating an allegation under DR 1-102(A)(4) is to determine whether the accused lawyer "engaged in 'conduct,' by doing something that the lawyer should not have done or by failing to do something that the lawyer was supposed to do." *In re Gustafson*, 327 Or 636, 643, 968 P2d 367 (1998). As explained below, we conclude that the Bar has not proved by clear and convincing evidence that the accused engaged in prohibited conduct under DR 1-102(A)(4); we therefore need not proceed to any other inquiries under that rule.

The specific conduct at issue here is the accused's conduct in presenting both his *ex parte* motions. In its brief, the Bar argues that it was impermissible for the accused to present both the motions *ex parte*; however, the overall tenor of the Bar's argument encompasses the accused's conduct in providing eleventh-hour notice to Kosydar. We address each aspect of the accused's *ex parte* motions below.

As to the *ex parte* nature of the accused's motions, we conclude that the Bar has not proved by clear and convincing evidence that the accused engaged in prohibited conduct under DR 1-102(A)(4). In our view, Judge Nachtigal might have been correct in assessing that the accused's motions were not of the type that, ordinarily, a lawyer should present *ex parte*—particularly when, as here, the accused knew that opposing counsel would object. However, the Bar has pointed to no source of law or any other applicable authority that specifically prohibited the accused from presenting his motions *ex parte*; instead, the Bar argues that the accused "had no basis to believe that either motion was appropriate to bring *ex parte*" and relies in part upon Judge Nachtigal's statements to the accused in that regard. The problem with the

Bar's argument—and it is insurmountable—is that it is merely that: an *argument*. Arguing that the accused was not permitted to present his motions *ex parte* does not make it so, and it certainly is insufficient to prove that "the truth of the facts asserted is highly probable," which is the Bar's burden. *Cohen,* 316 Or at 659. In short, the Bar has not proved by clear and convincing evidence that, in presenting his motions on an *ex parte* basis, the accused "engaged in 'conduct,' by doing something that [he] should not have done." *Gustafson,* 327 Or at 643.[17]

As to the accused's conduct in providing eleventh-hour notice of his *ex parte* motions to Kosydar, we similarly conclude that the Bar has not proved by clear and convincing evidence that the accused engaged in prohibited conduct under DR 1-102(A)(4). Again, the Bar has not pointed to any source of law or other applicable authority that prohibited the accused from notifying Kosydar of his written motions when he did. Further, as to the accused's second *ex parte* motion, the record demonstrates that the accused appeared to have had no other available option to protect his clients' interests, in light of the lack of response from Judge Nachtigal and Kosydar respecting his repeated requests for a final payoff figure. As with the accused's decision to present both his motions *ex parte*, the Bar has not proved by clear and convincing evidence that the accused "[did] something that [he] should not have done," *Gustafson,* 327 Or at 643, when he provided eleventh-hour notice of his motions to Kosydar.

Because we conclude that the Bar has not proved by clear and convincing evidence that the accused engaged in

---

[17] We note that the Bar does cite Judicial Rule (JR) 2-102, which clarifies when a *judge*—not a lawyer—is permitted to communicate *ex parte* with a lawyer in an adversary proceeding. *See* JR 2-102(B) (judge shall not communicate with lawyer about any matter in adversary proceeding outside course of proceeding, except with parties' consent or as authorized by law or permitted by judicial rule); JR 2-102(C) (judge may, in certain circumstances, communicate regarding scheduling, administrative purposes, or emergencies not dealing with substantive matters or merits). However, *the accused's* actions in communicating with the court *ex parte* are subject to the requirements of DR 7-110(B), which permits certain lawyer-initiated communications in addition to those that JR 2-102 permits for judges. *See* 337 Or at 205-06 (setting out DR 7-110(B), including DR 7-110(B)(4), which encompasses permissible judicial *ex parte* communications under Judicial Rule 2). We already have concluded that the accused's conduct did not run afoul of DR 7-110(B)(2) or (3), as the Bar alleged in its amended complaint.

prohibited conduct under DR 1-102(A)(4), we further conclude that the Bar has not proved any violation of that rule.

### E. *DR 5-101(A)(1)*

■ DR 5-101(A) provides, in part:

"Except with the consent of the lawyer's client after full disclosure,

"(1) a lawyer shall not accept or continue employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will or reasonably may be affected by the lawyer's own financial, business, property, or personal interests. * * *"

DR 10-101(B) provides, in part:

"(1) 'Full disclosure' means an explanation sufficient to apprise the recipient, of the potential adverse impact on the recipient of the matter to which the recipient is asked to consent.

"(2) As used in DR 5-101 * * *, 'full disclosure' shall also include a recommendation that the recipient seek independent legal advice to determine if consent should be given and shall be contemporaneously confirmed in writing."

The Bar contends, and the trial panel agreed, that the accused violated DR 5-101(A)(1) when he requested that the trial court satisfy the sanction judgments from the sale proceeds—judgments for which he was jointly liable and that were accruing interest at a lower interest rate than the principal judgment against the Kerbers. The accused responds that no conflict of interest existed because Taylor could not have pursued any deficiency on the principal judgment against the Kerbers as a matter of law. Alternatively, the accused contends that he fully disclosed any conflict of interest to the Kerbers and obtained their consent to request satisfaction of the sanction judgments.

We disagree with the accused that DR 5-101(A)(1) does not, in light of his legal theory respecting any deficiency judgment, reach the conduct at issue here. As the wording of the rule makes clear, DR 5-101(A)(1) reaches circumstances in which a lawyer's professional judgment *"reasonably may*

*be affected*" (emphasis added) by the lawyer's own interests, as well as situations in which the lawyer's judgment *will* be affected. *See In re Knappenberger*, 337 Or 15, 27-28, 90 P3d 614 (2004) (wording of rule that exercise of professional judgment "reasonably may be affected" by lawyer's personal or financial interests "expresses a lesser degree of certainty and sweeps more broadly" than "will be * * * affected" wording); *In re Lawrence*, 332 Or 502, 506, 512, 31 P3d 1078 (2001) (accused lawyer violated DR 5-101(A)(1) by not fully disclosing potential conflict of interest in avoiding acknowledged malpractice liability). Here, the accused had a financial interest in having the sanction judgments satisfied, while the Kerbers had a financial interest in having the principal judgment satisfied. Even if the accused ultimately had been correct that Taylor could not have pursued any deficiency judgment on the principal against the Kerbers, the Kerbers were entitled to have the opportunity to seek advice in that regard from independent counsel—counsel whose personal financial interests were not reasonably implicated in a decision to pursue satisfaction of the sanction judgments.

We turn to the disclosure requirements of DR 5-101(A)(1), more specifically, DR 10-101(B)(2). In that connection, we acknowledge that the accused had numerous discussions with the Kerbers regarding his conclusion that Taylor could not seek a deficiency judgment and that he notified the Kerbers orally and in writing of Kosydar's concern regarding a conflict of interest. We further acknowledge that the Kerbers acquiesced in the accused's plan to request satisfaction of the sanction judgments and that, as the accused and the Kerbers agreed, the accused ultimately paid those judgments in full.

Nonetheless, it is apparent from the record that the accused did not advise the Kerbers to seek the advice of independent counsel respecting his conflict of interest and, it follows, did not confirm such advice in writing, as DR 10-101(B)(2) requires. As this court noted in *Lawrence*, 332 Or at 512, that requirement "may [not] be dispensed with so casually." In light of the accused's failure to comply with DR 10-101(B)(2), we conclude that his conduct violated DR 5-101(A)(1). *See id.* at 512 (accused lawyer who failed to comply with DR 10-101(B)(2) violated DR 5-101(A), notwithstanding

lawyer's other actions to protect client's interest, including securing outside counsel on particular issue that gave rise to conflict of interest).[18]

## III. SANCTION

 Having found that the accused violated a disciplinary rule, we turn to the issue of the appropriate sanction, following our well-established methodology. We first refer to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards), to make a preliminary determination of the appropriate sanction, by considering the duty or duties that the accused violated, his mental state at the time of his misconduct, and the injury that his misconduct caused. ABA Standard 3.0. We then consider the existence of any aggravating or mitigating circumstances and consider this court's relevant case law. *See In re Kluge*, 335 Or 326, 348, 66 P3d 492 (2003) (setting out methodology).

A. *Preliminary Analysis*

In failing to comply with the disciplinary rules respecting full disclosure of a conflict of interest, the accused violated his duty owed to his clients, the Kerbers. ABA Standard 4.3. We conclude that the accused knowingly engaged in that misconduct. *See* ABA Standards at 7 (defining "knowledge" as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result"). Further, the accused caused potential injury to the Kerbers by denying them the opportunity to seek independent advice regarding satisfaction of the sanction judgments. *See id.* (defining "potential injury" as harm that is reasonably foreseeable at

---

[18] The Bar also charged the accused with violating DR 7-102(A)(2) (knowingly advancing legally unwarranted claim or defense) when he requested satisfaction of the sanction judgments against him and the Kerbers. As noted earlier, the trial panel's opinion did not mention that allegation, and the Bar likewise does not mention it on review.

The Bar has presented no evidence that, in requesting satisfaction of the sanction judgments or in asserting that Taylor could not have collected any deficiency on the principal judgment, the accused advanced any claim or defense unwarranted under existing law. We therefore conclude that the Bar has not proved that particular allegation under DR 7-102(A)(2).

time of misconduct and that, but for some intervening event, probably would have resulted from misconduct).

Considering the duties violated, the accused's mental state, and the harm caused, the ABA Standards suggest that a suspension would be the appropriate sanction here. *See* ABA Standard 4.32 (suspension generally appropriate when lawyer knows of conflict of interest and does not fully disclose possible effect of conflict and causes potential injury to client).

## B. *Aggravating and Mitigating Factors*

We conclude that one aggravating factor applies, that is, that the accused had substantial experience in the practice of law at the time of his misconduct.[19] ABA Standard 9.22(i). We further conclude that two mitigating factors apply. First, the accused has no prior disciplinary record. ABA Standard 9.32(a). Second, this case involves the factor of significant delay, with the accused's misconduct having occurred in 1998. ABA Standard 9.32(j) (amended 1992). *See also In re Unrein*, 323 Or 285, 288, 917 P2d 1022 (1996) (applying that mitigating factor in light of four-year delay in proceeding; factor "especially significant" because, during period of delay, no further complaints filed against accused lawyer);[20] *compare In re Devers*, 328 Or 230, 244 n 7, 974 P2d 191 (1999) (declining to apply that mitigating factor when accused lawyer shared responsibility for delay). Consistently with *Unrein*, 323 Or at 288, we give heightened significance to the delay in the proceedings against the accused. *See also Lawrence*, 332 Or at 515 (similarly characterizing long delay in proceeding as "important" mitigating factor, when accused lawyer's disciplinary record was "unblemished" since engaging in the misconduct at issue).

On balance, the mitigating factors outweigh the single aggravating factor here. That, in turn, suggests that a public reprimand, rather than a suspension, might be appropriate.

---

[19] The accused was admitted to the Bar in 1989.

[20] Nothing in the record suggests that the accused is alleged to have committed any further disciplinary rule violations since committing the misconduct at issue or that the accused contributed in any way to the delay in the proceedings.

## C. *Case Law*

This court's decision in *Lawrence*, 332 Or 502, confirms that a public reprimand, rather than a suspension, is the appropriate sanction here. The accused lawyer in *Lawrence*, among other misconduct, had failed to comply with the full disclosure requirements of DR 5-101(A)(1). There, a trial court had entered a default judgment against the lawyer's client in a dissolution action, after the lawyer had missed a filing deadline. The lawyer arranged for other counsel to represent the client on the default matter; however, the lawyer continued to represent the client on child support and visitation matters, "without making full written disclosure to [the client] of the possibility that his own interests in avoiding a[n] [acknowledged] malpractice claim might affect his professional judgment." *Id.* at 506.

This court concluded that the accused lawyer had violated DR 5-101(A). *Id.* at 512. As to the appropriate sanction for that particular violation, the court accepted the parties' agreement that a public reprimand was appropriate. *Id.* at 513. The court ultimately imposed a 60-day suspension for the lawyer's collective misconduct. *Id.* at 517.

## D. *Appropriate Sanction*

Having considered the applicable ABA Standards, the applicable aggravating and mitigating factors, and this court's case law, we conclude that a public reprimand is the appropriate sanction here.

The accused is reprimanded.